UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

                                         :

        - v -                                07 Cr. 543 (CLB)

                                         :

YEHEZKEL ELIA and DAVID ELYAHO,    :

                Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

### Preliminary Statement

This case involves a massive income tax fraud by Yehezekel Elia and his brother, David

Elayho. The proof at trial will demonstrate that Elia, though a series of corporate vehicles and

businesses, concealed his tremendous income and filed numerous false tax returns, principally by

reporting only the credit card payments which were electronically posted into his corporate bank

accounts (and which as a result could not be hidden). Because his numerous corporations and

stores (sneaker stores, a pizza parlor, a jewelry store and others) did tremendous cash businesses,

and because he did not want to report that cash as income, he did not deposit the cash into his

bank accounts. Similarly, because his business purchases actually exceeded the amount of gross

receipts that he was reporting on his corporate tax returns, he paid by check only enough of his

business expenses to substantially minimize the income which would be reported by his

corporations. Likewise, recognizing that he could not pay out over years much more than he was

reporting that he had earned, he paid many vendors by money order and postal money orders. In

1

fact, the evidence will show that Elia went to extraordinary means to defeat and to thwart the collection of taxes, on some occasions obtaining multiple money orders from multiple locations on the same dates, breaking down the denominations of the money orders, all so that he could avoid having the financial institutions file currency transaction reports, which in turn, would alert the IRS to the amount of cash he was handling. In fact, the proof will show that over a five year period, Elia waited on line somewhere or another to purchase over $8,414,601.00 in money orders, at eleven different locations, creating approximately 12,000 separate financial transactions – all to avoid depositing cash into his bank account. Often he traveled to three or more different locations to purchase money orders on a single day, in order to avoid hitting the threshhold which would trigger the filing of a cash report at any one location.

Although his businesses were tremendously profitable, according to his tax returns Elia's companies had only minimal sales and purchased only a minimal inventory (which effectively negated most of the income), when in truth and fact, they were significant businesses with a tremendous volume of business and a tremendous inventory, with a tremendous profit margin and an even greater cash business. While a large amount of the money orders went to purchase inventory for his businesses, some money orders were used to pay personal expenses (college tuitions, property taxes and other personal bills) and then large amounts of cash simply were syphoned out of the companies. The Government anticipates that the proof at trial will establish that on occasion Elia was seen with a suitcase filled with hundreds of thousands of dollars of cash.

David Elyaho, Elia's brother, took part in the scheme to the extent that he managed the day to day operations of Final Touch Jewelry, one of the profitable Elia companies

2

that did business in the above manner. In addition, when Elia was on vacation or out of town and unable to collect his daily cash receipts from his companies, David Elyaho would fill in and collect the cash on his brother's behalf from the various Elia companies. The records of Final Touch were maintained with the records of the other Elia companies and the proof will show that many of the cash withdrawls from the businesses were contemporaneously chronicled in journals that the defendants maintained and aptly entitled "David's Book" and "Hezi's Book" ("Hezi" being Elia's nickname).

## Background

### The Search Warrants

On February 24, 2004 the Internal Revenue Service executed search warrants on locations occupied by Elia's businesses known as Sneaker Mania, Sports Stop and Elia's corporate headquarters. One of the premises searched was the storefront location of Sneaker Mania, a store located in a strip mall at Cross County Shopping Center in Yonkers. The search warrant stated that Sneaker Mania's storefront address was "1BB Xavier Drive," whereas, according to Elia's motion, the actual address for the storefront allegedly was 1F Xavier Drive (although Elia offers no proof of this assertion). As is set forth in the accompanying affidavit of Patrick Longo, however, 1BB Xavier Drive was the address used by Sneaker Mania on its tax return, therefore, that was the address that was put into the search warrant. The store, however, was a clearly marked store in a strip mall, and was clearly named Sneaker Mania. The premises intended by the warrant were searched.

3

Similarly, the warrant for Sneaker Mania's administrative offices stated that the offices were located in Suite 803 of 6 Xavier Drive. As is set forth in the Affidavit of Patrick Longo, a videotape of the search which was created on the date of the search reflects that on the day of the search the office location was clearly marked Suite "803." Apparently, some time after the search, the legend on the door was changed to Suite "802" however, on the date of the search, the suite was clearly marked as 803.

## The Supporting Affidavit

In support of the application for search warrants the Government submitted the Affidavit of Special Agent Herbert Eis, from the Internal Revenue Service ("Eis Affidavit"). The application sought evidence of tax crimes (evasion and the filing of false tax returns) in violation of Title 18 USC Sections 7201 and 7206(1) and for alleged violations of the cash structuring laws, in violation of Title 31 USC Section 5324. Among other things, the Eis Affidavit explains that corporations are required to file annual tax returns which accurately reflect their total gross receipts and to accurately report the deductions and credits to which they are entitled. (Eis at 5). Based upon his review of tax returns, postal records, financial records and information from a Confidential Informant, Eis concluded that there was probable cause to believe that Elia had under reported his gross receipts (which effectively concedes in his motion) and that he was structuring his financial transactions in order to evade the cash reporting requirements of financial institutions.

According to the Eis Affidavit, a Confidential Informant (the "CI") approached the Government in March of 2003. The CI had worked for Elia for four years as his bookkeeper and was the primary person responsible for maintaining the financial records of various Elia

4

companies. In addition, the CI paid bills, collected rents (Eis 7), and also collected cash and credit card receipts from each of Elia's stores. (Eis 8). According to the CI, Elia's practice was to collect the cash generated by his businesses on a daily basis. (Eis 8). The CI told federal agents that although the credit card settlements were posted to the corporate bank accounts, most of the cash generated by the businesses was neither deposited nor reported as income. (Eis 10).

The CI provided the Government with bank account statements from two of Elia's corporate bank accounts and those statements corroborated the CI, as they reflected that although there were numerous credit card deposits, there were very few cash deposits into the corporate accounts. In addition, the CI was further corroborated by other bank records obtained by investigating agents, which also reflected that the deposits into Elia's corporate accounts came almost exclusively from credit card settlements. (Eis 12).

In addition, according to the CI, Elia used cash for his personal use and he maintained an account at Schwab, from which he had wire transferred money to Israel. (Eis 12). Schwab records, in turn, corroborated the information from the CI, as they reflected that Elia maintained an account over which he had power of attorney and that the monthly statements on the account were sent to Elia's business address. The Schwab account was maintained in the name of Elia's brother, an Isreali citizen and reflected that Elia had transferred over $100,000 to accounts located in Israel.

The CI also told agents about an incident where Elia had been stopped by Customs for trying to carry cash out of the country. Records of United States Customs, in turn, corroborated that information, as they indicated that Elia was caught in an outbound exam at JFK Airport, carrying $43,992 in cash that he had failed to declare. (Eis 15).

5

The CI also provided agents with financial records which reflected sales figures for Pizza Mania, Sneaker Mania and Final Touch Jewelry, some of Elia's companies. The sales figures recorded in the company records were substantially higher than the numbers that were reported on the tax returns filed by Elia for the respective corporations. (Eis 17). Likewise, the CI provided agents with sales records pertaining to numerous entities run by Elia – entities for which the IRS could find no record of tax returns ever having been filed, which in turn, indicated to Eis that the gross sales were under reported by even greater amounts than they initially appeared. (Eis 18).

The CI also told agents that Elia paid for the majority of his business expenses by money orders rather than checks. Based upon his experience investigating financial crimes, Eis was of the opinion that the use of money orders was a way for Elia to conceal the extent of his business activities and thereby make it easier for him to understate his gross reciepts. (Eis 19). Further, a review of Postal records reflected that in a relatively short time period, Elia had purchased over one thousand money orders from various post offices in White Plains. (Eis 21-22). Many of the money orders were simultaneously purchased in denominations of $700 and were negotiated by vendors, commercial finance companies and real estate companies. (Eis 23-25). By way of representative example, Eis told of three dates where records reflected that Eila had purchased 47 postal money orders, totalling $32,900.00. Although the daily purchases exceeded $10,000, it appeared that care had been given to purchasing the money orders in small denominations from numerous locations, so that currency reporting requirements would not result in the filing of a cash report. (*See* Eis at 26 for various examples).

6

Based upon this information and all of the records he reviewed, Eis concluded that there was probable cause to believe that Elia was filing false tax returns (understating his gross receipts), evading the payment of taxes and structuring his financial transactions in order to avoid currency reporting requirements. On February 20, 2004 United States Magistrate Judge Mark D. Fox agreed and issued search warrants.

**The Indictment**

Following a lengthy investigation, a grand jury Indicted Elia and his brother, Elyaho, for numerous tax offenses. Specifically, the Indictment charges both Elia and Elyaho with participation in a conspiracy to impair, impede and obstruct the collection of taxes arising out of the business of Final Touch. Final Touch is a jewelry company and one of Elia's companies. The Indictment charges that Elyaho was responsible for running the day to day business of Final Touch. In addition, both Elyaho and Elia are charged with personal evasion of taxes and with filing false tax returns. In addition, Elia, as the owner of the various Elia companies, is charged with subscribing to false corporate tax returns for Final Touch as well as two of his other companies.

The Government anticipates that the proof at trial will show that Elia ran all of his companies in the same manner as he ran Final Touch, syphoniong the cash from the entities on a daily basis. Because his business interests were so intertwined and often shared bank accounts, the proof of tax offenses in connection with one company is exactly the same proof as in connection with Elia's other companies, and involves the same witnesses. Likewise, there are numerous business names which were utilized by Elia which businesses did not file tax returns, making the proof even further intertwined.

7

In addition, the proof will show that Elia and Elyaho tracked their cash withdrawls from Final Touch in a book entitled "David's Book." Similarly, Elia maintained a record of his cash withdrawls from his other businesses in two books entitled "Hezi's book." The Government anticipates that the proof at trial will show that David ran the businesses for Elia whenever Elia went on vacation, or was for some other reason unable to attend to the daily collection of cash and purchases of money orders.

## Summary of the Argument

The warrants were soundly based on probable cause, supported by the Affidavit of Herbert Eis (the Eis Affidavit). Eis based his application on his review of tax records, bank records, postal records and records provided to him by a Confidential Informant, which were independently corroborated. Obviously, the Magistrate Judge who authorized the warrants agreed that there was probable cause to believe that the search would yield proof of tax and structuring charges.

Elia challenges the warrant on numerous grounds, none of which have any merit or relevance to whether or not there was probable cause to believe that the searches would yield evidence of criminal conduct. Essentially, Elia contends that the Government could have or should have done a more through investigation prior to obtaining the warrants. Similarly, without support, Elia claims that the CI altered and destroyed records. As is set forth in the Eis Affidavit, the Government corroborated information given to it by the CI, through its independent review of tax, postal, Customs and bank records and that collective information gave it probable cause to believe that Elia was engaging in criminal conduct and that evidence of such would be found in his premises.

8

In addition, Elyaho's motion for severance is without merit, as the cases against brothers

Elia and Elyaho arise out of the same scheme and plan and involve the exact same proof and

witness testimony. That Elia is charged with more crimes is of no moment, as presumably in

accordance with the Court's usual practice the jury will be instructed to consider the guilt of each

defendant individually.

## POINT ONE
## The Warrants Were Not Defective

In *Velardi v. Walsh*, 40 F.3d 569 (2d Cir. 1994), the Court of Appeals for the

Second Circuit set forth the standard for particularity in a search warrant: "It is enough if the

description is such that the officers armed with a search warrant can with reasonable effort

ascertain and identify the place intended." *Id.* at 576 (internal quotation marks and citation

omitted); *see also United States v. Dahlman*, 13 F.3d 1391, 1394 (10th Cir. 1993) (warrant

sufficiently describes location to be searched, "if [it] enables the officers to ascertain the place to

be searched with reasonable effort.") (internal quotation marks omitted). Further, Fourth

Amendment challenges to warrants that contain partial *misdescriptions* of the place to be

searched have been rejected so long as the officer executing the warrant was able "ascertain and

identify the target of the search with no reasonable probability of searching another premises in

error." *United States v. Valentine*, 984 F.2d 906, 909 (8th Cir. 1993). Here, there is no doubt

that the warrants were sufficiently particular such that the seizing officers were able to locate the

appropriate places to be searched.

Elia argues that the warrant which called for the search of Suite 803 of 6 Xavier

Drive should be invalidated because his offices were located in Suite 802 of 6 Xavier Drive. In

9

support of this argument, Elia provides an affidavit attesting to the fact that his offices are located "in Suite 802 of 6 Xavier Drive." As is set forth in the Longo Declaration, the warrant for the search of Suite 803 of 6 Xavier Drive was perfectly proper, as on the date of the search the Suite was clearly labeled Suite 803. Although apparently sometime after the search and presumably at some date before January 9, 2008 -- when Elia attested to the fact that his offices are located in Suite 802 -- either Elia or someone else posted Suite 802 on the door to his offices, however, on the day of the search it was clearly labeled Suite 803. Longo's recollection is conclusively supported by a videotape of the search, which was created on the day of the search, and which reflects that Elia's offices were inside a suite labeled Suite 803. Elia's attempt to mislead the Court about this issue is a sorry statement about how desperate he is to attempt to thwart the Government's case and borders on sanctionable.

Likewise, Elia contends that the warrant calling for the search of the Sneaker Mania store should be invalidated because Sneaker Mania was located at 1F Xavier Drive rather than 1BB Xavier Drive, as was listed in the warrant. Elia offers no proof of his store's number address on the date of the serach, however, the purported dispute regarding whether the proper address is 1F or 1BB Xavier Drive is academic. The warrant was to search the store, which is located in a strip mall at the Cross County Shopping Center, on Xavier Drive. There is no dispute that Sneaker Mania was the store meant by the warrant and that the front of the store was clearly marked "SNEAKERMANIA." Accordingly, assuming *arguendo* that Elia is correct that the proper address for Sneaker Mania was 1F Xavier Drive (an assumption which he has not proven), then there was no harm, because place intended by the search warrant was searched. As is set forth in the Longo Affidavit. 1BB Xavier Drive was the address used by Sneaker Mania itself on some

10

of its tax returns and, accordingly, that was the address that made its way into the warrant.

Accordingly, even if the street address for the store was incorrectly referenced in the warrant

(which Elia has not proven), the proper store nonetheless was searched and, accordingly, there

was no harm.

## POINT TWO
### The Affidavit Clearly Established Probable Cause

The Fourth Amendment provides that search warrants shall not be issued, except

"upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.  The legal

standard for determining whether a particular search warrant application is supported by probable

cause is well established. "The task of the issuing magistrate is simply to make a practical,

common-sense decision whether given all the circumstances set forth in the affidavit before him .

. . there is a *fair probability* that contraband or evidence of a crime will be found in a particular

place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added). Such determinations must

be approached in a practical way, *id.* at 232, because "probable cause is a flexible common-sense

standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983).  "The process does not deal with hard

certainties, but with probabilities. . . . [T]he evidence . . . must be seen and weighed not in terms

of library analysis by scholars, but as understood by those versed in the field of law

enforcement." *Illinois v. Gates*, 462 U.S. at 231-32 (*quoting United States v. Cortez*, 449 U.S.

411, 418 (1981)).

The duty of a court reviewing a lower court's probable cause determination is

"simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable

cause existed." Gates, 462 U.S. at 238-39 (internal quotations omitted); *see United States v.*

11

*Rosa*, 11 F.3d 315, 326 (2d Cir. 1993); *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993);

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991). "A search warrant issued by a neutral

and detached magistrate is entitled to substantial deference, and 'doubts should be resolved in

favor of upholding the warrant.' " *Rosa*, 11 F.3d at 326 (quoting *United States v. Travisano*, 724

F.2d 341, 345 (2d Cir. 1983)); *see Gates*, 462 U.S. at 236; *Smith*, 9 F.3d at 1012. Indeed, "the

magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity

of [the] warrant." *Travisano,* 724 F.2d at 345; *accord United States v. Jackstadt*, 617 F.2d 12, 13

(2d Cir. 1980).

Notwithstanding Elia's arguments to the contrary, when the Eis Affidavit is

reviewed in light of these standards, it is clear that the issuance of the warrants was supported by

more than adequate probable cause. As is summarized at length above, pages 4-6 *supra*, the

affidavit established that there was reason to believe that a search of the subject premises would

yield evidence of tax crimes as well as structuring, which, in fact, they did. Specifically, it

appeared to Eis that Elia was not filing accurate corporate tax returns, accurately reporting his

gross sales and purchases. In addition, Eis relied primarily upon postal records which appeared

to reflect that Elia had purchased a tremendous amount of money orders, at multiple locations on

the same dates. Eis attested that it appeared to him that Elia's mulitple financial transactions on

the same days at different locations were structured in order to avoid cash reporting

requirements. In addition, Eis relied upon information he received from a CI and he set forth the

manner in which he had independently corroborated such information.

Elia, however, contends that the Eis Affidavit was based upon faulty assumptions,

inadequate investigation and that some of the information given by the CI was erroneous.

12

Essentially, it appears from his motion that Elia intends to challenge the veracity of isolated bits

of information provided by the CI, isolated entries contained in his business documents, and it

further appears that he will contend that the tax loss figures may be substantially lower than those

set forth in the Indictment. Elia will have his day in court on those issues at trial; those

arguments have no bearing on whether or not there was probable cause to believe that his offices

contained evidence of criminal conduct, which they unquestionably did. Each of Elia's

arguments are addressed below.

## A. The Schwab Account and the Customs Stop

Elia argues that Eis either knew or should have known when he signed the search warrant

Affidavit that a Schwab account (through which Elia transferred $100,000 to accounts in Israel)

was not funded by "cash" deposits. Further, he argues that it was misleading to infer that this

account provided a representative example of cash from Elia's businesses being syphoned out for

personal use, as the Schwab account statements allegedly reflect only five $100 cash deposits.

(Genuth Affidavit at 5). Separately, Elia argues that his attempted transportation of over

$40,000 in cash in a canvas bag to Isreal was not a diversion of corporate funds. He argues that

because the United States Customs Service returned a large portion of that money to him later,

that the return of funds establishes that the funds were not diverted. [1] Assuming, *arguendo*, that

these arguments are even marginally relevant to the probable cause determination, they are not

---

[1] Elia attests in his Affidavit that "the cash that was seized from me at JFK in July 2001, was returned to me....I did not 'get into trouble with Customs' as Mr. Eis states in his affidavit." (Elia at paragraph 8.) Apparently, Elia forgot that he was fined $5,000 for his false statement and that he did, in fact, get into "trouble" – albeit not criminal trouble.

13

only misleading but they also urge this Court to reach conclusions which Eila full well knows are wrong.

As is set forth in the Longo Declaration, on July 25, 2001 Elia was stopped by the United States Customs Service, leaving JFK Airport to travel to Israel, with $43,992 in cash in his suitcase. Prior to boarding a plane to Isreal, Elia falsely swore that he was carrying less than $10,000 in cash. Elia was allowed to leave the country with some cash and the balance of the cash ($42,000) was seized by Customs, as probable contraband. Elia thereafter filed a petition for the return of the seized cash in which *he stated that the cash was generated by his legitimate businesses* and to support that assertion, Elia provided Customs with tax returns from his driving school, to show his affiliation with a legitimate business. Customs thereafter fined Elia $5,000 for making a false statement and returned the balance of the money in the form of a $37,000 check. Schwab records indicated that on January 18, 2002, Elia deposited the $37,000 check (the check which represented the cash which he told Customs had been generated by his businesses) into the Schwab account – the account which he now argues was not the recipient of any cash from his businesses (other than $500). Accordingly, the Schwab account was the recipient of at least $37,000 in cash from his businesses, albiet, that cash was seized from him when he tried to sneak it out of the country, and then was converted by the federal government into a check. His assertion that the Schwab account did not receive any cash other than $500 from his businesses and that the Eis Affidavit is misleading, therefore, is disingenuous and exalts form over substance.

14

## B.  The Information From the Confidential Informant Was Corroborated and Reliable

Elia also argues that Eis either knew or should have known that the CI was unreliable,

that the CI had no valid reason to be on Elia's premises after the CI resigned, and that entries on

the sample sales journals provided by the CI were inaccurate.   The Eis Affidavit establishes

however, that at each and every turn the informant was corroborated, by records provided by the

CI as well as by records obtained independently by the Government pursuant to grand jury

subpoenas and other means.   The Eis Affidavit further states that after the CI resigned from

Elia's businesses, the CI continued to collect rents for Elia and to visit the business premises on a

monthly basis in order to give Elia the money which she collected.  Significantly, Elia does not

deny that assertion in his affidavit; instead he states that Lily "never had business with [his]

office after her resignation."

### 1.  The Sales Journal

As proof of the CI's purported unreliability Elia contends that the Government either

knew or should have known that an entry in a journal provided by the CI to the Government was

incorrect.  Specifically, he argues that a purchases from an unnamed primary vendor were

understated in his company ledgers.  This arguments misses the mark.

According to the Eis Affidavit, the sales reported on the records provided by the CI were

substantially higher than those reported on the tax returns, which in turn, indicated to Eis that

Elia likely had under reported his gross sales on his corporate tax returns, in violation of 26 USC

Section 7206(1).  In his motion, Elia effectively concedes that he filed false tax returns and under

reported his gross sales, however, he contends that the warrant should be invalidated because, in

substance, the CI did not accurately report his false statements.  Specifically, he points to an

15

allegedly inaccurate entry pertaining to purchases from an unnamed vendor which allegedly failed to properly report hundreds of thousands of dollars of his purchases from that vendor. The veracity of an entry which allegedly understates the extent of Elia's tax crimes surely does not invalidate the probable cause that he was committing tax offenses. At most, it establishes that his conduct was worse than the Government recognized when it obtained the warrant and makes the warrant even more compelling.

## 2. Vendor Invoices

As further proof of the CI's alleged unreliability, Elia faults the Government for failing to subpoena vendor invoices prior to seeking authorization for a search, which he contends would have established that the one above-referenced entry was inaccurate. Generally, however, for obvious reasons when the Government suspects ongoing criminal conduct by a company and is contemplating a search warrant, it does not announce its interest in the company to third parties before obtaining the search warrant. If the Government had subpoenaed all of Elia's vendors, word likely would have gotten to Elia that his conduct was under investigation, which, in turn, may have negatively impacted the success of the searches.

## 3. Allegedly "Altered" Entry in Pizza Record

Elia contends that the Government should have known that the information provided by the CI was unreliable because a sheet pertaining to his pizza business contained an entry for 9/31 which, he contends (without support), that the CI later changed to 10/31 when she realized that her entry was easily detectable as fabricated. Likewise, he contends without support that the Government should have known that the CI destroyed additional invoices from his other companies which would have diminished his tax liability. These unlikely arguments, however,

16

have no bearing on the issue of probable cause or the overwhelming corroboration of all of the information which was provided by the CI and the overwhelming evidence of diversion of cash which the Government had when it obtained the warrants. If the CI testifies at trial, then Elia may (or may not) be entitled to explore these arguments, which bear no particular relevance to the charges in the Indictment, where he has been given the benefit of the doubt as to each and every possible erroneous entry (and then some).

## 4. Cash Allegedly Not Diverted

Next Elia argues that because cash was used to purchase money orders, it was not "diverted." This argument is a red herring: corporations are required to accurately report gross receipts as well as purchases – he effectively concedes that he did neither -- and yet, he signed the subject tax returns under penalty of perjury, in violation of 26 USC 7206(1) . The affidavit clearly established probable cause to believe that he was committing tax offenses. Whether or not he "diverted" casb is a question unrelated to whether or not there was reason to believe that Elia was committing tax and structuring offenses. As is set forth in the Eis Affidavit, the Government had reason to believe that Elia was hiding huge amounts of cash that his companies bad earned and that he was structuring his financial transactions in order to avoid cash reporting requirements.

## 5. Reported Income

Next Elia argues that the Government knew that he had reported cash earnings because his personal tax returns reported income which exceeded the amounts that he had received by payroll check from his companies. As is set forth in the Longo Declaration, although Elia reported annual income from his driving school (a company which was not the subject of the

17

search warrant application) and while he did report a minimal amount of income from his pizza shop in some years (which may have included some cash income), he NEVER reported ANY income from Sneaker Mania or Final Touch Jewelry. Accordingly, this argument – like all of Elia's other arguments – is an indication of a proffered "defense" to the criminal charges, but is not relevant to the validity of the search warrant.

Accordingly, because the applicaton for search warrants was solidly grounded on probable cause to believe that Elia was engaging in tax and structuring offenses, the suppression motion must be denied.

## POINT THREE
## The Good Faith Exception to the Exclusionary Rule Bars Suppression

Assuming *arguendo* that the warrants were issued on less than probable cause, the good faith exception to the exclusionary rule would prevent suppression in this case. The Supreme Court has held that the exclusionary rule and its harsh remedy of suppression should not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984).

"The essential rationale underlying [this] good faith exception is that the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.' " *United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (quoting *Leon*, 468 U.S. at 919); *see also Arizona v. Evans*, 514 U.S. 1, 10 (1995) (use of exclusionary rule is not warranted where it does not result in deterrence). The pivotal question in a particular case is thus "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23; *see also United States*

18

*v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992). If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression is not warranted. *See e.g., United States v. Roberts*, 852 F.2d 671, 675 (2d Cir. 1988).

The only instances where the good faith exception does not apply are where: (1) the magistrate was misled by information the affiant knew was false; (2) the magistrate wholly abandoned his judicial rule; (3) the supporting affidavit lacked any indicia of probable cause; or (4) the warrant was insufficiently specific. *Leon*, 468 U.S. at 923. Elia has not established that any of the four actions which would preclude the application of the good faith exception occurred in this case.

## POINT FOUR
## Count One is Not Duplicitous

An indictment is duplicitous where: "1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir.2001). The fact that a single count charges several acts does not necessarily render it duplicitous, however. "To the contrary, [the Second Circuit] has long held that 'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.'" *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir.2006) (*quoting United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir.1989)). See also United States v. Salameh, 152 F.3d 88, 148 (2d Cir.1998) (stating that defendant was properly charged "with membership in a single conspiracy with multiple criminal objectives");*United States v. Coffey*, 361 F.Supp.2d 102, 110 (E.D.N.Y.2005) ("A charge of

conspiracy to commit several crimes in one count is not duplicitous because the crime is conspiracy which is one crime regardless of the diversity of its objects") (citing *Fohwerk v. United States*, 249 U.S. 204, 210(1919)). With respect to conspiracy charges, the Second Circuit has stated that [a] conspiracy indictment presents "unique issues" in the duplicity analysis because "a single agreement may encompass multiple illegal objects." In this Circuit "it is well established that [t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for [t]he conspiracy is the crime and that is one, however diverse its objects."*United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir.1992) (*quoting United States v. Murray*, 618 F.2d 892, 896 (2d Cir.1980)) (additional internal quotation marks omitted). *See also Braverman v. United States*, 317 U.S. 49, 53 (1942) ("Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one"), cited in *Aracri*, 968 F.2d at 1518. See also United States v. Zeidman, 540 F.2d 314, 317 (7th Cir.1976) (single count of mail fraud not duplicitous even though allegations embraced two classes of victims and could have been charged in separate counts).

Elyaho contends that Count One -- a conspiracy charge -- is duplicitous because it "improperly lumps together separate allegations of fraudulent conduct as to the individual tax returns of Yehezkel Elia, the individual tax returns of David Elyaho and the corporate tax returns for Final Touch over an extended 6 year time period into a single count." Elyaho Br. at 3. Reading the Indictment, however, it is evident that the conspiracy charges a single conspiracy, a standard *Klein* Conspiracy, 247 F.2d 908 (2d Cir. 1957), between Elyaho and his brother, Elia,

to imped, impair, defeat and obstruct the lawful governmental functions of the Internal Revenue Service in the ascertainment, evaluation, assessment, computation and collection of income taxes over a six year period. Of course, as with any multiple year tax conspiracy, there are multiple corresponding substantive tax crimes which may arise from that conduct, however, the crime charged in Count One is the conspiracy. As such, the count alleges a "single continuing scheme." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989). *See also Braverman v. United States,* 317 U.S. 49, 54 (1942)("(t)he allegation in a single count of conspiracy to commit several crimes is not duplicitous, for 'the conspiracy is the crime and that is one, however diverse its objects.'") (quoting *Frohwerk v. United States*, 249 U.S. 204, 210, (1919); *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980).

In any event, even a "[d]uplicitous pleading ... is not presumptively invalid." *Olmeda*, 461 F.3d at 281, unless it prejudices the defendant. *Sturdivant*, 244 F.3d at 75. Furthermore, even if an indictment is duplicitous, and even if that duplicity presents some risk of prejudice to the defendant, that risk can often be avoided through jury instructions making clear to the jurors that they must unanimously agree on the particular conduct underlying the conviction. *Sturdivant*, 244 F.3d at 79; *see, e.g., United States v. Helmsley*, 941 F.2d 71, 91 (2d Cir.1991) ("any possibility of a duplicitous verdict was removed by Judge Walker's careful charge regarding unanimity on Count 1"); *Zeidman*, 540 F.2d at 317-18 (defendants could not claim prejudice, since the "trial judge clearly instructed the jury that they must not return a guilty verdict unless they all agreed that the defendants had devised a scheme to defraud at least the creditor or the debtor"); *W.R. Grace*, 429 F.Supp.2d at 1225 (D.Mont.2006) ("steps can be taken to protect the defendants from the risk of a non-unanimous verdict," such as "curative instructions to the jury,

21

special interrogatories to insure unanimity, or the dismissal of all or part of the offending count).

Accordingly, even if Count One were duplicitous – which it is not– such defect could be cured by

a curative instruction to the jury and would not in any event warrant dismissal.

## POINT FIVE
## Elyaho is Not Entitled to Severance

### A. Fed. R. Crim. P. 8

"Joint trials play a vital role in the criminal justice system." Richardson v. Marsh, 481

U.S. 200, 209 (1987). Among other advantages, joint trials "conserve state funds, diminish

inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of

crime to trial." Bruton v. United States, 391 U.S. 123, 134 (1968). Additionally, joint trials

"serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."

Richardson, 481 U.S. at 210.

Federal Rule of Criminal Procedure 8 provides for joinder of offenses and joinder of

defendants: Rule 8(a) governs the joinder of offenses, while Rule 8(b) governs the joinder of

parties. See Fed. R. Crim. P. 8. When multiple parties are charged with multiple offenses, joinder

must be proper under the more restrictive test of Rule 8(b). United States v. Turoff, 853 F.2d

1037, 1043 (2d Cir. 1988). That is, "multiple defendants may be charged with and tried for

multiple offenses only if the offenses are . . . part of a series of acts or transactions constituting . .

. offenses." Id. Offenses and defendants are properly joined under Rule 8(b) where the criminal

acts of two or more persons are "'unified by some substantial identity of facts or participants' or

'arise out of a common plan or scheme.'" United States v. Attansio, 870 F.2d 809, 815 (2d Cir.

1989). However, two separate transactions do not constitute a "series" within the meaning of

22

Rule 8(b) "merely because they are of a similar character or involve one or more common participants." United States v. Lech, 161 F.R.D. 255, 256 (S.D.N.Y. 1995) (internal citation omitted); see also United States v. Rittweger, 259 F. Supp. 2d 275, 283 (S.D.N.Y. 2003).

## 1. **Rule 8(b)**

Here, joinder of Counts One (a conspiracy count) and the other tax counts charged against Elyaho with the tax counts charged against Elia is proper. The actions alleged in the Indictment demonstrate a substantial identity of facts and arise out of a common plan or scheme, namely to evade and avoid the payment of taxes and to thwart the orderly collection of taxes. All of these allegations are "inextricably interrelated." See Sattar, 272 F. Supp. 2d 348, 379. At trial, the Government intends to prove that Elyaho was Elia's willing co-conspirator and that he was a beneficiary of the tax evasion arising out of Elia's Final Touch jewelry business. Elyaho managed the Final Touch business and covered for Elia when Eila was out of town or otherwise unavailable. In addition to a conspiracy to thwart and defeat the collection of taxes in connection with Final Touch, both Elia and Elyaho are charged with personal tax evasion. Although the charges against Elia contain tax crimes arising from two of his other businesses, those two businesses were run in exactly the same manner, the records were maintained together and the tax returns were prepared in the same manner, and under the control of the same bookkeeper, at the same location.

Using a "common sense approach," it is clear that "a reasonable person would easily recognize the common factual elements that permit joinder." United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003). Here, Elia and Elayho were brothers and partners in crime. The fact

that Elyaho was not charged with complicity in connection with two of Elia's companies is of no moment, as he was instrumental to the success of the scheme.

Elia's contention that joinder may cause him to forfeit the exculpatory testimony of his brother is far fetched. First, Elyaho offers mere speculation about what Elyaho might say after the conclusion of his own trial, and presumably, only if he is acquitted. Second, the proffered speculative testimony is not particularly helpful. Elyaho proffers that Elia might testify that Elyaho was not an officer of any of the Elia companies, a fact which can easily be proven through alternate sources and which the Government does not anticipate will be in dispute. Second, he proffers that Elia apparently might testify that Elyaho merely followed his orders – testimony which is hardly exculpatory. Third, he contends that Elia might somehow corroborate that Elyaho had no role in his businesses and no knowledge as to the tax filings of Final Touch. Among items of proof which the Government will offer at trial is the book that Elyaho maintained, entitled "David's Book" which before Indictment Elyaho stipulated was created by him, in which Elyaho contemporaneously chronicled the cash withdrawls of him and his brother from Final Touch. Accordingly, the speculative guessing about what Elia might say, if he chose to testify does not compel severance.

Courts have routinely held that severance cannot be granted on the basis of a vague, unsupported assertion that a co-defendant might testify favorably in a separate proceeding. *United States v. Andrus*, 775 F.2d 825, 847 (7th Cir.1985); *see also United States v. Kord*, 836 F.2d 368, 373 (7th Cir.). The mere possibility of a co-defendant's testimony is insufficient grounds for a severance.), *cert. denied,*488 U.S. 824 (1988) Elyaho relies upon the Seventh Circuit's decision in *United States v. Echeles,* 352 F.2d 892 (7th Cir.1965), but his reliance is

24

misplaced. In *Echeles,* the Seventh Circuit stated that the defendant should not be foreclosed of the possibility that the witness would testify on his behalf merely because that eventuality was not a certainty. *Id.* at 898. In *Echeles,* however, it seemed more likely than not that the witness would have testified on behalf of the defendant because he previously had done so three times in open court contrary to his own penal interest. *Id.* Here, Elia has not definitively represented that he would testify, has never testified on Elyaho's behalf in the past, and he has a history of making false and/or misleading statements under oath (to Customs and to this Court in this motion). Accordingly, even if Elia were prepared to say something helpful to Elyaho, the value of his testimony would be of extremely limited value and might even hurt Elyaho's case, as Elia previously made false statements to Customs Officers and he has filed a patently misleading Affidavit in his case and would be subjected to cross-examination about those prior false statements.

### 2. **Rule 8(a)**

To the extent that Elyaho argues that he is entitled to a severance of the Elia tax counts because they are based on the separate acts or transactions the motion is meritless. First, because "joinder in this case is appropriate under the more restrictive standard of Rule 8(b), it necessarily follows that it also appropriate under Rule 8(a)." *United States v. DiPietro*, 2005 WL 783357,at *4 (S.D.N.Y. Apr. 6, 2005).

Second, joinder is appropriate if, among other things, the offenses charged are of the same or similar character. Fed. R. Crim. P. 8(a). The rule does not require that the two crimes be the same but instead requires that they possess a general likeness, be somewhat alike, or resemble each other in many respects. *United States v. Werner*, 620 F.2d 922, 926 (2d Cir.1980) (citing

25

Webster's New International Dictionary 2d ed.). Here the crimes are nearly identical and their proof will involve the same exact witness testimony and clearly of a same or similar character.

Third, "[j]oinder is proper where the same evidence may be used to prove each count." *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir.1991). In *Blakney*, a defendant was charged with selling both narcotics and firearms. The evidence showed that he sold both commodities to the same customers and attempted to barter one good for another. The Court of Appeals held that "[t]he evidence in support of the two counts was thus interconnected, and the interests of judicial efficiency were served by having the counts tried together." *Id.* As in Blakney, the Government will be using the same evidence to prove the different counts in the instant Indictment.

Therefore, there is no basis under Rule 8(a) to sever the counts against Elyaho from those against Elia.

## B. Fed. R. Crim. P. 14

Nor is there a basis for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides, in relevant part, that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." The Supreme Court teaches that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). There is a preference for joint trials in the federal system for defendants who are indicted together. Joint

26

trials promote efficiency and promote the interests of justice, by, among other means, avoiding inconsistent verdicts. *Id.* at 537.

A defendant seeking such a severance "must show that he [will be] so severely prejudiced by the joinder as to [be] denied a fair trial, not that he might have [ ] a better chance for acquittal at a separate trial." *United States v. Torres*, 901 F.2d 205, 230 (2d Cir. 1990) (citations and internal quotation marks omitted). Given the balance struck by Rule 8, which "authorizes some prejudice" against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in "substantial prejudice." *Turoff*, 853 F.2d at 1043; *see United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990) (defendant must show he was so severely prejudiced by spillover evidence that joint trial constituted a miscarriage of justice). "A motion for severance under Rule 14 is addressed to the discretion of the trial court, ... and the sound exercise of that discretion is virtually unreviewable." *United States v. Arocena*, 778 F.2d 943, 949 (2d Cir. 1985).

Here, Elyaho argues that a severance under Rule 14 is needed because of "prejudicial spillover." Specifically, he argues that his brother's tax fraud is more egregious than his own, and therefore, he will be denied a fair trial. The crimes charged against the brothers are substantially similar and arise out of the same events, involve the same witnesses and are of the same nature. To the extent that Elyaho fears that the large tax figures charges against his brother will prejudice his own tax case, the Government is confident that the Court's instructions on the law will make abundantly clear that there are different crimes charged in different counts against different defendants. *United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2000) (denial of severance proper where possibility of prejudicial spillover was minimal because the court instructed the jury to

consider each defendant's guilt individually); *United States v. Thronton*, 197 F.3d 241, 255-56 (7th Cir. 1999) (denial of severance upheld because it is presumed that jury will follow limiting instructions to consider each count separately).

The judicial economy of avoiding two trials, in which all of the evidence supporting all of counts is introduced twice, compels the conclusion that defendants' request for a severance should be denied.

## C. Bruton

Finally, Elyaho moves for a severance on the ground that Elia's statements to law enforcement may raise a *Bruton* issue. Because Elyaho's *Bruton* motion, far in advance of trial, is premature, his motion should be denied.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that a defendant is denied rights under the Confrontation Clause of the Sixth Amendment when a non-testifying co-defendant's confession inculpating the defendant is offered at their joint trial. A Bruton violation occurs only when the co-defendant's statement is both clearly inculpatory and vitally important to the governments case. *United States v. Slocum*, 695 F.2d 650, 655 (2d Cir. 1982). Subsequent decisions of the Supreme Court and Second Circuit have clarified the rule to hold that such statements may be admitted if redacted to omit any explicit reference to the defendant, if they do not, when viewed in isolation clearly implicate the defendant, and if they are not redacted in such a way to signal that a redaction was made. *See, e.g., Grey v. Maryland*, 523 U.S. 185 (1998); *Richardson v. Marsh*, 481 U.S. at 208; *United States v. Smith*, 198 F.2d 377, 385 (2d Cir. 1999); *United States v. Kyles*, 40 F.3d 519, 526 (2d Cir. 1994). The Second Circuit has explained:

28

> Since Richardson, we have on several occasions admitted redacted
> confessions in which names of codefendants were replaced by
> neutral pronouns and "where the statement standing alone does not
> otherwise connect co-defendants to the crimes." These decisions
> have uniformly held that the appropriate analysis to be used when
> applying the Bruton rule requires that we view the redacted
> confession in isolation from other evidence introduced at trial. If
> the confession, when so viewed, does not incriminate the
> defendant, then it may be admitted . . . even though other evidence
> in the case indicates that the neutral pronoun is in fact a reference
> to the defendant.

*United States v. Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991) (citations omitted).

Although the Supreme Court in *Grey v. Maryland* held that redacted statements were

inadmissible in a joint trial where the omission of a party was made obvious by use of terms such

as "deleted" in place of the defendant's name, this Circuit has since reiterated its approval of the

use of neutral pronouns. *See United States v. Sanin*, 252 F.3d 79, 85 (2d Cir. 2001) (confirming

that prior to Grey the Second Circuit had already recognized the distinction between redacted

confessions that are facially incriminating and those that are "properly redacted to protect the

defendant's Sixth Amendment rights"). Proper redaction, together with a limiting instruction –

which jurors are presumed to follow – is sufficient to protect a defendant's right to confrontation.

*See Richardson v. Marsh*, 481 U.S. at 208. This is clearly preferable to severance and multiple

trials. As the *Richardson* court stated:

> It would impair both the efficiency and the fairness of the criminal justice
> system to require . . . that prosecutors bring separate proceedings,
> presenting the same evidence again and again, requiring victims and
> witnesses to repeat the inconvenience (and sometimes trauma) of
> testifying, and randomly favoring the last-tried defendants who have the
> advantage of knowing the prosecution's case beforehand. Joint trials
> generally serve the interests of justice by avoiding inconsistent verdicts
> and enabling more accurate assessment of relative culpability – advantages
> which sometimes operate to the defendant's benefit. Even apart from

29

these considerations, joint trials generally serve the interests of justice by
avoiding the scandal and inequity of inconsistent verdicts.

481 U.S. at 210; *United States v. Shareef*, 190 F.3d 71, 77-78 (2d Cir. 1999).

At this point, Elyaho's argument is based on mere speculation since the Government has

not yet sought to introduce any statements made by his co-defendant. The Government

represents that any statements which it intends to use at trial will be redacted to comply with

*Bruton* and its progeny, and the redactions will be provided to defense counsel sufficiently in

advance of trial to enable the Court to deal with any possible objections. See *United States v.*

*Otibu*, 2002 WL 1033882, at *3 (May 21, 2002) (Schwartz, J.) (denying *Bruton* motion as

premature); *United States v. Feliciano*, 2002 WL 575662, at *4 (Apr. 16. 2002) (Buchwald, J.)

(same); *United States v. Gallo*, 1999 WL 9848, at *9 (Jan. 11, 1999) (Koeltl, J.). (same).

As a result, Elyaho's *Bruton* motion should be denied.

## POINT SIX
### Elyaho's Discovery Motions Are Meritless

Elyaho moves to compel the Government to provide additional discovery. Because the

defendant has already received all of the pre-trial disclosure to which he is entitled, Elyaho's

motions should be denied.

### A.    Fed. R. Evid. 404(b)

Rule 404(b) requires only that the Government provide the defense "reasonable notice in

advance of trial" that it plans to introduce evidence of a defendant's prior bad acts or crimes.

Fed. R. Evid. 404(b) (emphasis added). Rule 404(b) permits the introduction of evidence of

other acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or

absence of mistake or accident," Fed. R. Evid. 404(b), "or any purpose other than to show a

defendant's criminal propensity." <u>United States</u> v. <u>Pitre</u>, 960 F.2d 1112, 1118 (2d Cir. 1992). As

the Second Circuit has repeatedly stated, the court takes an "inclusionary" approach to evidence

under Rule 404(b), providing that such evidence is admissible when offered for <u>any</u> purpose

other than proving action in conformity with character. <u>See United States</u> v. <u>Pascarella</u>, 84 F.3d

61, 69 (2d Cir. 1996).

The Government proposes, two calendar weeks before trial, to provide notice of other

crimes or bad acts, if any, that the Government will seek to prove at trial pursuant to Rule 404(b),

to the extent that such information has not already been provided. [2] If other crimes evidence is

discovered or becomes relevant after that point, or during the trial, the Government will bring

such evidence to the immediate attention of the defense and the Court. *See United States v.

Castro*, No. 94 Cr. 809 (JFK), 1995 WL 6235, at *3 (S.D.N.Y. Jan. 6, 1995).

Accordingly, Elyaho's motion for early production of Rule 404(b) evidence should be

denied.

## B.    <u>Witness List</u>

Nothing in Rule 16 or any other statute or rule obligates the Government to disclose the

identity of its prospective witnesses.[3] As the Second Circuit has explained, "Fed. R. Crim. P. 16

---

[2] The Government has already provided Elia with notice of some 404(b) proof which it
will offer at trial.

[3]       To the extent that Elyaho asks for criminal histories of the Government's
witnesses, a request to compel production of witness statements and impeachment material is
wholly premature at this time. *See United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001)
(holding that as a general rule, *Brady* and its progeny do not require immediate disclosure of all
exculpatory and impeachment material upon request by a defendant and that the "Jencks Act
prohibits a District Court from ordering the pretrial disclosure of witness statements"); <u>United
States v. Nunez</u>, 2001 WL 91708, at *8 (S.D.N.Y. Feb. 1, 2001) ("There is no constitutional right
to have early disclosure of <u>Giglio</u> and 3500 material"); *United States v. Gutierrez-Flores*, 1994

31

does not require the Government to furnish the names and addresses of its witnesses." *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990). *United States v. Cannone*, 528 F.2d 296 (2d Cir. 1975), makes clear that a defendant is entitled to disclosure of the Government's witnesses only if he makes "a *specific* showing that the disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." Id. at 301. A mere "abstract conclusory claim that such disclosure [is] necessary to [the] proper preparation for trial" is insufficient. Id. at 301-02 (abuse of discretion for the district court to grant defense motion for a witness list supported by only general statement of need); *see also United States v. Biaggi*, 675 F. Supp. at 810-11; *United States v. Feola*, 651 F. Supp. at 1138.

The law is clear that, "absent 'some particularized showing of need,' the defendant is not entitled to lists of government witnesses . . . ." *United States v. Wilson*, 565 F. Supp. 1416, 1438 (S.D.N.Y. 1983), *overruled on other grounds, United States v. Reed*, 773 F.2d 477 (2d Cir. 1985). Because this "heavy burden," *United States v. Alvalle*, 1985 WL 2348, at *1 (S.D.N.Y. Aug. 22, 1985), can rarely be met, requests for witness lists are routinely denied in this District. *See, e.g., United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998) (Kaplan, J.); *United States v. Perez*, 940 F. Supp. 540, 552 (S.D.N.Y. 1996).

---

WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994) (disclosure of impeachment material not required "until the witness is called to testify").

Consistent with the regular practice in this District, the Government intends to make impeachment material available to the defense at the time it provides material pursuant to 18 U.S.C. § 3500 – at least "one day prior to the day the witness is called to testify on direct examination." *Gutierrez-Flores*, 1994 WL 558034, at *3. Moreover, in order to avoid any delay in the trial, the Government will produce such materials sufficiently in advance of each Government witnesses' testimony. This practice will allow defense counsel adequate time to prepare for cross-examination of Government witnesses as they come up at trial.

32

In this case, Elyaho has made no showing whatsoever that disclosure of the Government's witnesses is both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case. Accordingly, Elyaho's motion for a "government witness list" should be denied.[4]

## POINT SEVEN
## The Government is Entitled to Reciprocal Discovery

The Government moves for reciprocal discovery pursuant to Fed. R. Crim. P. 16(b)(1)(A) & (B). The Government moves the court for an order directing the defendants to permit the Government: (1) to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies of portions thereof, which are in the possession, custody, or control of the defendants, which the defendants intend to introduce in chief at the trial; and (2) to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendants, which the defendants intend to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendants intend to call at the trial when the results or reports relate to that witness' testimony.

At the pretrial conferences in this case the defendants have stated that they are gathering voluminous records from third parties, by subpoena and otherwise. If those records are not made available to the Government for inspection and copying before trial the trial necessarily will be substantially delayed.

_____

[4] In accordance with the Court's direction at the last pretrial conference, the Government is in the process of preparing its anticipated Exhibit List for early production.

## Conclusion

For the forgoing reasons, the defendants' pretrial motions should be denied and the

Government should be granted reciprocal discovery.

White Plains, New York
January 31, 2008

Respectfully submitted,
MICHAEL J. GARCIA
United States Attorney

By: _____

CYNTHIA K. DUNNE
Assistant United States Attorney
Tel. Nos.: (914) 993-1913

34