UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v -

                             07 Cr. 543 (CM)

YEHEZKEL ELIA and DAVID ELYAHO,

          Defendants.

## DECISION AND ORDER ON DEFENDANTS'
## PRETRIAL MOTIONS

Yehezkel Elia and his brother, David Elyaho, are charged in the instant indictment with participation in a conspiracy to impair, impede and obstruct the collection of taxes arising out of businesses owned by Elia. The Indictment also charges the brothers with evasion of taxes and with filing false tax returns.

Yehezkel Elia has filed a motion asking the Court to suppress evidence seized, pursuant to a search warrant, from two stores and an office Elia leases at the Cross County Shopping Center in Yonkers, New York. Elia argues that suppression is warranted because *inter alia*: the locations to be searched were not described correctly; the warrant was based on an affidavit from an I.R.S. Special Agent, Herbert Eis, whose essential source of information was a confidential informant whose reliability was not previously established, not corroborated and demonstrably inadequate; (3) the confidential informant provided information to Agent Eis that was contrary to the documentary evidence Eis said he had reviewed; (4) the affidavit that Eis signed omitted essential facts that changed the meaning of the government's evidence and distorted the facts available to the magistrate, thereby undermining the magistrate's ability to make an informed and thoughtful determination as

to whether probable cause existed to issue the warrants. (Elia Memo at 1-2).

David Elyaho has filed motions asking the Court to: (1) dismiss Count One of the Indictment upon the ground that it is duplicitous, within the meaning of Fed. R. Crim. P. 12(b)(3)(B); (2) sever the counts that charge only Elyaho from the rest of the indictment, pursuant to Fed. R. Crim. P. 8 (b); (3) sever Elayaho case from his brother's case, due to prejudicial joinder, pursuant to Fed. R. Crim. P. 14; (4) direct the Government to make early disclosure of a witness list, its case-in-chief exhibits, witness statements and impeachment materials and Rule 404(b) evidence; and (5) adopt his codefendant's motion to the extent applicable.

Elyaho supplemented his motions by submitting an affidavit in support of standing to join in his brother's suppression motion. (Elyaho affidavit dated January 18, 2008). Elia, in turn, filed papers asking the Court to allow him to join in Elyaho's motions. Indeed, to the extent a particular motion filed by one defendant was relevant to the other defendant's case, the Court considered the non-moving defendant to have moved on the same ground.

The Government opposes defendants' motions and moves for reciprocal discovery pursuant to Fed R. Crim. P. 16(b)(1)(A) & (B).

<u>The Eis Affidavit in Support of the Search Warrants</u>

On February 24, 2004 the Internal Revenue Service executed search warrants issued by United States Magistrate Judge Mark D. Fox, on locations occupied by Elia's businesses known as Sneaker Mania, Sports Stop and Elia's corporate headquarters.

In support of the application for search warrants the Government submitted the Affidavit of Special Agent Herbert Eis, from the Internal Revenue Service ("Eis Affidavit"). The application sought evidence of tax crimes (evasion and the filing of false tax returns) in violation of Title 18

2

USC Sections 7201 and 7206(1) and for alleged violations of the cash structuring laws, in violation

of Title 31 USC Section 5324. Among other things, the Eis Affidavit explains that corporations are

required to file annual tax returns which accurately reflect their total gross receipts and to accurately

report the deductions and credits to which they are entitled. (Eis at 5). Based upon his review of

tax returns, postal records, financial records and information from a Confidential Informant, Eis

concluded that there was probable cause to believe that Elia had under reported his gross receipts

and that he was structuring his financial transactions in order to evade the cash reporting

requirements of financial institutions.

According to the Eis Affidavit, a Confidential Informant (the "CI") approached the

Government in March of 2003. The CI had worked for Elia for four years as his bookkeeper and was

the primary person responsible for maintaining the financial records of various Elia companies. In

addition, the CI paid bills, collected rents (Eis 7), and also collected cash and credit card receipts

from each of Elia's stores. (Eis 8). According to the CI, Elia's practice was to collect the cash

generated by his businesses on a daily basis. (Eis 8). The CI told federal agents that although the

credit card settlements were posted to the corporate bank accounts, most of the cash generated by

the businesses was neither deposited nor reported as income. (Eis 10).

The CI provided the Government with bank account statements from two of Elia's corporate

bank accounts and those statements corroborated the CI, as they reflected that although there were

numerous credit card deposits, there were very few cash deposits into the corporate accounts. In

addition, the CI was further corroborated by other bank records obtained by investigating agents,

which also reflected that the deposits into Elia's corporate accounts came almost exclusively from

credit card settlements.    (Eis 12).

3

In addition, according to the CI, Elia used cash for his personal use and he maintained an account at Schwab, from which he had wire transferred money to Israel. (Eis 12). Schwab records, in turn, corroborated the information from the CI, as they reflected that Elia maintained an account over which he had power of attorney and that the monthly statements on the account were sent to Elia's business address. The Schwab account was maintained in the name of Elia's brother, an Isreali citizen and reflected that Elia had transferred over $100,000 to accounts located in Israel.

The CI also told agents about an incident where Elia had been stopped by Customs for trying to carry cash out of the country. Records of United States Customs, in turn, corroborated that information, as they indicated that Elia was caught in an outbound exam at JFK Airport, carrying $43,992 in cash that he had failed to declare. (Eis 15).

The CI also provided agents with financial records which reflected sales figures for Pizza Mania, Sneaker Mania and Final Touch Jewelry, some of Elia's companies. The sales figures recorded in the company records were substantially higher than the numbers that were reported on the tax returns filed by Elia for the respective corporations. (Eis 17). Likewise, the CI provided agents with sales records pertaining to numerous entities run by Elia – entities for which the IRS could find no record of tax returns ever having been filed, which in turn, indicated to Eis that the gross sales were under reported by even greater amounts than they initially appeared. (Eis 18).

The CI also told agents that Elia paid for the majority of his business expenses by money orders rather than checks. Based upon his experience investigating financial crimes, Eis was of the opinion that the use of money orders was a way for Elia to conceal the extent of his business activities and thereby make it easier for him to understate his gross reciepts. (Eis 19). Further, a review of Postal records reflected that in a relatively short time period, Elia had purchased over one

4

thousand money orders from various post offices in White Plains. (Eis 21-22). Many of the money orders were simultaneously purchased in denominations of $700 and were negotiated by vendors, commercial finance companies and real estate companies. (Eis 23-25). Indeed, Eis told of three dates where records reflected that Eila had purchased 47 postal money orders, totaling $32,900.00. Although the daily purchases exceeded $10,000, it appeared that care had been given to purchasing the money orders in small denominations from numerous locations, so that currency reporting requirements would not result in the filing of a cash report. (*See* Eis at 26 for various examples).

Based upon this information and all of the records he reviewed, Eis concluded that there was probable cause to believe that Elia was filing false tax returns (understating his gross receipts), evading the payment of taxes and structuring his financial transactions in order to avoid currency reporting requirements. On February 20, 2004 United States Magistrate Judge Mark D. Fox agreed and issued search warrants.

<u>The Indictment</u>

The Indictment charges Elia and Elyaho with participation in a conspiracy to impair, impede and obstruct the collection of taxes arising out of the business of Final Touch. Final Touch is a jewelry company and one of Elia's companies. Elyaho was allegedly responsible for running the day to day business of Final Touch. The Indictment also charges Elyaho and Elia with personal evasion of taxes and with filing false tax returns. Elia, as the owner of the various Elia companies, is charged with subscribing to false corporate tax returns for Final Touch as well as two of his other companies.

The Warrants were Sufficiently Particular

Elia argues that the warrants which called for the search of Suite 803 of 6 Xavier Drive and Sneaker Mania, 1BB Xavier Drive, should be invalidated because those were the wrong addresses for the places searched.

In Velardi v. Walsh, 40 F.3d 569 (2d Cir. 1994), the Court of Appeals for the Second Circuit set forth the standard for particularity in a search warrant: "It is enough if the description is such that the officers armed with a search warrant can with reasonable effort ascertain and identify the place intended." Id. at 576 (internal quotation marks and citation omitted). Fourth Amendment challenges to warrants that contain partial "misdescriptions" of the place to be searched have been rejected so long as the officer executing the warrant was able "ascertain and identify the target of the search with no reasonable probability of searching another premises in error." United States v. Valentine, 984 F.2d 906, 909 (8th Cir. 1993). Here, there is no doubt that the warrants were sufficiently particular such that the seizing officers were able to locate the appropriate places to be searched.

Elia argues that the warrant which called for the search of Suite 803 of 6 Xavier Drive should be invalidated because his offices were located in Suite 802 of 6 Xavier Drive. In support of this argument, Elia provides an affidavit attesting to the fact that his offices are located "in Suite 802 of 6 Xavier Drive." However, Special Agent Patrick Longo has submitted a declaration stating *inter alia* that, on the date of the search, the Suite was clearly labeled Suite 803. According to the Government, Longo's recollection of the Suite number is corroborated by a videotape of the search, which was created on the day of the search, and which reflects that Elia's offices were inside a suite labeled Suite 803. The Government suggests that Elia or someone else changed the number sometime after the search and before January 9, 2008, when Elia attested to the fact that his offices

6

are located in Suite 802. How the number came to be changed is of no moment for the Court in deciding the instant motion. It is clear from Longo's declaration and the Government's representation about what is depicted on the video of the search, that the suite searched was labeled "803." Therefore, the suite to be searched was properly identified in the warrant.

Elia also contends that the warrant calling for the search of the Sneaker Mania store should be invalidated because Sneaker Mania was located at 1F Xavier Drive rather than 1BB Xavier Drive, as was listed in the warrant. As is set forth in the Longo Affidavit, 1BB Xavier Drive was the address used by Sneaker Mania itself on some of its tax returns and, accordingly, that was the address that made its way into the warrant. Elia offers no proof of his store's number address on the date of the search.

However, the purported dispute regarding whether the proper address is 1F or 1BB Xavier Drive is academic. The warrant was to search the store, which is located in a strip mall at the Cross County Shopping Center, on Xavier Drive. There is no dispute that Sneaker Mania was the store meant by the warrant, that it was located on Xavier Drive at the Cross County Mall, and that the front of the store was clearly marked "SNEAKERMANIA." Thus, even if the street address for the store was incorrectly referenced in the warrant, the proper store was identified and searched.

### The Affidavit Established Probable Cause

Elia contends that the search warrants were not supported by probable cause because the Eis Affidavit in support of the warrants was based upon faulty assumptions, inadequate investigation and erroneous information given by the CI.

The legal standard for determining whether a particular search warrant application is supported by probable cause is well established: "The task of the issuing magistrate is simply to

make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him . . . there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added).

The duty of a court reviewing a lower court's probable cause determination is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Gates, 462 U.S. at 238-39 (internal quotations omitted); *see United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993); *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993); *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991). "A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'" *Rosa*, 11 F.3d at 326 (quoting *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)); *see Gates*, 462 U.S. at 236; *Smith*, 9 F.3d at 1012. Indeed, "the magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." *Travisano,* 724 F.2d at 345; *accord United States v. Jackstadt*, 617 F.2d 12, 13 (2d Cir. 1980).

Elia's various attacks on the Eis affidavit fail to undermine the magistrate's finding of probable cause.

### *The Alleged Misleading Evidence*

Elia argues that Eis either knew or should have known when he signed the search warrant Affidavit that a Schwab account (through which Elia transferred $100,000 to accounts in Israel) was not funded by "cash" deposits. He argues that it was misleading to infer that this account provided a representative example of cash from Elia's businesses being siphoned out for personal use, as the Schwab account statements allegedly reflect only five $100 cash deposits. (Genuth Affidavit at 5).

Elia also argues that his attempted transportation of over $43,992 in cash in a canvas bag to

8

Isreal was not a diversion of corporate funds. Elia contends that because the United States Customs Service returned a large portion of that money to him later, that the return of funds establishes that the funds were not diverted.

Special Agent Longo's Declaration negates Elia's argument on this point. On July 25, 2001, Elia was stopped by the United States Customs Service, leaving JFK Airport to travel to Israel, with $43,992 in cash in his suitcase. Prior to boarding a plane to Isreal, Elia falsely swore that he was carrying less than $10,000 in cash. Elia was allowed to leave the country with some cash and the balance of the cash ($42,000) was seized by Customs, as probable contraband. Elia thereafter filed a petition for the return of the seized cash in which *he stated that the cash was generated by his legitimate businesses* and to support that assertion, Elia provided Customs with tax returns from his driving school, to show his affiliation with a legitimate business. Customs thereafter fined Elia $5,000 for making a false statement and returned the balance of the money in the form of a $37,000 check. According to the Government, Schwab records indicate that on January 18, 2002, Elia deposited the $37,000 check (the check which represented the cash which he told Customs had been generated by his businesses) into the Schwab account.

Accordingly, Eis's affidavit was accurate when he stated Elia attempted to carry $43,992 out of the country and that the Schwab account was the recipient of cash from Elia's businesses.

Elia has not demonstrated that Special Agent Eis's affidavit contained false information, let alone that Eis new or should have known that the affidavit contained false information.

### Corroboration and Reliability of the CI

Elia argues that Eis either knew or should have known that the CI was unreliable and that the information the CI provided was inaccurate.

9

Elia argues that Eis should have known that the CI had no valid reason to be on Elia's premises after he terminated his employment with Elia and that entries on the sample sales journals provided by the CI were inaccurate. However, the Eis Affidavit states that after the CI resigned from Elia's businesses, the CI continued to collect rents for Elia and to visit the business premises on a monthly basis in order to give Elia the money which she collected.

As further proof of the CI's purported unreliability, Elia contends that the Government either knew or should have known that an entry in a journal provided by the CI to the Government was incorrect. Specifically, he argues that a purchases from an unnamed primary vendor were understated in his company ledgers. However, according to the Eis Affidavit, the sales reported on the records provided by the CI were substantially higher than those reported on the tax returns, which in turn, indicated to Eis that Elia likely had under reported his gross sales on his corporate tax returns. Elia contends that the warrant should be invalidated because the CI did not accurately report his false statements. He points to an allegedly inaccurate entry pertaining to purchases from an unnamed vendor which allegedly failed to properly report hundreds of thousands of dollars of his purchases from that vendor. This argument does little to advance defendant's position. The veracity of an entry which allegedly understates the extent of Elia's tax crimes does not invalidate the probable cause that he was committing tax offenses.

As further proof of the CI's unreliability, Elia argues that the Government should have known that the information provided by the CI was unreliable because a document pertaining to his pizza business contained an entry for "9/31." Elia contends that the CI later changed this entry to "10/31" when she realized that her entry was easily detectable as fabricated. Likewise, Elia contends that the Government should have known that the CI destroyed additional invoices from his other companies

10

which would have diminished his tax liability.  These arguments – no doubt foreshadowing defendant's cross examination of the CI at trial – do nothing to undermine the corroboration of all of the information that was provided by the CI and the evidence of diversion of cash which was put before the magistrate.

Finally, Elia argues that the Government knew that he had reported cash earnings because his personal tax returns reported income which exceeded the amounts that he had received by payroll check from his companies.  However, the Longo Declaration makes clear that Elia never reported **any** income from Sneaker Mania or Final Touch Jewelry.  He did report annual income from his driving school (which was not the subject of the search warrant application) and a minimal amount of income from his pizza shop in some years (which may have included some cash income).

Elia's attacks on the Eis affidavit suggest little more than possible defenses Elia may wish to raise at trial.  The Court is satisfied that the evidence put before Magistrate Judge Fox provided the magistrate with probable cause to believe that Elia was engaging in tax and structuring offenses. The Court is also satisfied that Special Agent Eis was sufficiently careful to ensure that the CI's information was reliable and accurate and that the agent did not attempt to mislead the magistrate.

Furthermore, even if the Court were to find that the warrants were issued on less than probable cause (I specifically do not so find), the good faith exception to the exclusionary rule would prevent suppression in this case.  United States v. Leon, 468 U.S. 897, 922 (1984).   The only instances where the good faith exception does not apply are where: (1) the magistrate was misled by information the affiant knew was false; (2) the magistrate wholly abandoned his judicial rule; (3) the supporting affidavit lacked any indicia of probable cause; or (4) the warrant was insufficiently

specific. <u>Leon</u>, 468 U.S. at 923. Elia has not established that any of the four actions which would preclude the application of the good faith exception occurred in this case.

Elia's motion to suppress is denied.[1]

<u>Count One is Not Duplicitous</u>

Elyaho contends that Count One -- a conspiracy charge -- is duplicitous because it "improperly lumps together separate allegations of fraudulent conduct as to the individual tax returns of Yehezkel Elia, the individual tax returns of David Elyaho and the corporate tax returns for Final Touch over an extended 6 year time period into a single count." Elyaho Br. at 3.

An indictment is duplicitous where: "1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." <u>United States v. Sturdivant</u>, 244 F.3d 71, 75 (2d Cir.2001). However, "'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.'" <u>United States v. Olmeda</u>, 461 F.3d 271, 281 (2d Cir.2006) (<u>quoting</u> <u>United States v. Tutino</u>, 883 F.2d 1125, 1141 (2d Cir.1989)). With respect to conspiracy charges, the Second Circuit has stated that a conspiracy indictment presents "unique issues" in the duplicity analysis because "a single agreement may encompass multiple illegal objects." In this Circuit "it is well established that the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects." <u>United States v. Aracri</u>, 968 F.2d 1512, 1518 (2d Cir.1992) (<u>quoting</u> <u>United States v. Murray</u>, 618 F.2d 892, 896 (2d Cir.1980).

_____

[1] Since the Court has upheld the search warrants, the Court need not decide whether defendant Elyaho has standing to challenge those searches.

In the present case, the Indictment charges a single conspiracy between Elyaho and his brother, Elia, to impede, impair, defeat and obstruct the lawful governmental functions of the Internal Revenue Service in the ascertainment, evaluation, assessment, computation and collection of income taxes over a six year period. As such, the count alleges a "single continuing scheme." *Tutino*, 883 F.2d at 1141. *See also Braverman v. United States*, 317 U.S. 49, 54 (1942).

Elyaho's motion to dismiss the conspiracy count as duplicitous is denied.

Elyaho's Severance Motions

Elyaho asks the Court to sever the counts in the indictment that charge only Elyaho from the rest of the counts, pursuant to Fed. R. Crim. P. 8 (b). He also asks for a complete severance from his brother's case, pursuant to Fed. R. Crim. P. 14 and Bruton v. United States, 391 U.S. 123 (1968).

*Rule 8(b)*

Offenses and defendants are properly joined under Rule 8(b) where the criminal acts of two or more persons are "'unified by some substantial identity of facts or participants' or 'arise out of a common plan or scheme.'" United States v. Attansio, 870 F.2d 809, 815 (2d Cir. 1989). The Government states that it intends to prove at trial that Elyaho was Elia's willing co-conspirator and that he was a beneficiary of the tax evasion arising out of Elia's Final Touch jewelry business, that Elyaho managed the Final Touch business and covered for Elia when Eila was out of town or otherwise unavailable. In addition to a conspiracy to thwart and defeat the collection of taxes in connection with Final Touch, both Elia and Elyaho are charged with personal tax evasion. Although the charges against Elia contain tax crimes arising from two of his other businesses, those two businesses were run in exactly the same manner, the records were maintained together and the tax

returns were prepared in the same manner, and under the control of the same bookkeeper, at the same location.

Accordingly, the Elyaho Counts are properly joined with the balance of the indictment.

*Fed. R. Crim. P. 14*

Elyaho argues that a severance under Rule 14 is warranted because (1) he will suffer prejudicial spillover from evidence about his brother's allegedly more egregious fraud and (2) he will be forced to forgo possible exculpatory testimony by his brother.

Rule 14 provides, in relevant part, that "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." "A district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). There is a preference for joint trials in the federal system for defendants who are indicted together. Joint trials promote efficiency and promote the interests of justice, by, among other means, avoiding inconsistent verdicts. *Id.* at 537.

A defendant seeking such a severance "must show that he [will be] so severely prejudiced by the joinder as to [be] denied a fair trial, not that he might have [ ] a better chance for acquittal at a separate trial." *United States v. Torres*, 901 F.2d 205, 230 (2d Cir. 1990) (citations and internal quotation marks omitted). Given the balance struck by Rule 8, which "authorizes some prejudice" against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden

14

of showing that joinder will result in "substantial prejudice." *Turoff*, 853 F.2d at 1043; *see United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990).

Here, Elyaho argues that a severance under Rule 14 is needed because his brother's tax fraud is more egregious than his own, and therefore, he will suffer "prejudicial spillover." While Elia's tax fraud is more extensive than Elyaho's, the crimes charged against the brothers are substantially similar and arise out of the same events and, according to the Government, involve the same witnesses. To the extent that Elyaho fears that the large tax figures contained in the charges against his brother will prejudice his own tax case, the Court's instructions on the law will make abundantly clear that there are different crimes charged in different counts against different defendants. *United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2000). There is no reason to believe that the jury will fail to abide by Courts instructions on this point.

Elayho argues that severance is also warranted under Rule 14 to prevent the prejudice he says he will suffer if he cannot not call Elia as a witness. In deciding whether to grant severance based on the defendant's need to call a co-defendant, a district court should consider "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." United States v. Wilson, 11 F.3d 346 (2d Cir. 1993)(quoting United States v. Finkelstein, 526 F.2d 517, 523-24 (2d Cir.1975), cert. denied, 425 U.S. 960 (1976)..

Elyaho has not made a sufficient showing that Elia would actually testify on his brother's behalf or that the proffered testimony would not be cumulative. The only way Elia would be in a position to testify on Elyaho's behalf without risking self incrimination is if Elia's case is tried first

15

**and Elia is acquitted**. Even if that contingency came to pass, the proffered testimony would be either cumulative or of little value to Elyaho's defense.

Elyaho speculates that his brother would testify that Elyaho was not an officer of any of the Elia companies, a fact which can easily be proven through alternate sources and which the Government represents will not even be in dispute. Elyaho further speculated that Elia might corroborate that Elyaho had no role in his businesses and no knowledge about the tax filings of Final Touch. However, the Government states that it will offer in evidence the book that Elyaho maintained, entitled "David's Book," in which Elyaho contemporaneously chronicled the cash withdrawls of him and his brother from Final Touch. Prior to his indictment, Elyaho stipulated that he created "David's book." Given the limited value of Elia's testimony, Elia'a testimony may even hurt Elyaho's case, as the Government would be sure to exploit any false statements by Elia, including his false statements to Customs Officers (see supra at 9-10). Since the value of Elia's putative testimony is negligible, judicial economy concerns militate against severance.

Severance pursuant to Rule 14 is denied.

### Bruton

Elyaho moves for a severance on the ground that Elia's statements to law enforcement may raise a *Bruton* issue. Before the Court can pass upon such a motion, it needs to know whether the Government will be seeking to introduce any statements at trial that will present issues under Bruton v. United States, 391 U.S. 123 (1968) and/or Crawford v. Washington, 547 U.S. 36 (2004). While no specific discovery rule requires the Government to provide defendants with statements made by their co-defendants that might raise issues under Crawford or Bruton, proper case management requires that such statements be provided to the defense sufficiently in advance of trial so that those

issues can be resolved pre-trial. Accordingly, the Government will provide notice of any statements presenting a possible <u>Bruton</u>/<u>Crawford</u> issue within one week of this decision. If <u>Bruton</u>/<u>Crawford</u> motions will be made, they must be made within two weeks after that.

<u>Discovery Motions</u>

After the trial date is selected, the Court will set a time table for the disclosure of all 404(b), <u>Giglio</u> and 3500 material.

<u>Government's Motion for Reciprocal Discovery</u>

The United States requests that the defendant be required to provided the Government with reciprocal discovery pursuant to Rule 16(b)(1)(A) and (B) of the Federal Rules of Criminal Procedure. That motion is granted.

This constitutes the decision and order of the Court.

March 28, 2008

Colleen McMahon
U.S.D.J.

BY HAND TO:

Jared J. Scharf
Jared J. Scharf, Esq.
1025 Westchester Avenue, Suite 305
White Plains, NY 10604
(914) 682-9777
Fax: (914) 428-3199

Joseph A. Vita
Joseph A. Vita Law Office
327 Irving Avenue
Port Chester, NY 10573
(914)-939-5401
Fax: (914)-690-2007
Email: joev63542@aol.com

Cynthia Keeffe Dunne
U.S. Attorney's Office, White Plains
300 Quarropas Street
White Plains, NY 10601
(914) 993-1913
Fax: (914) 993-1980

18