UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x
                                :

UNITED STATES OF AMERICA        :
                                :

          - v. -                 :
                                :                  07 Cr. 543 (KMK)

YEHEZKEL ELIA, and          :
DAVID ELYAHO,               :
                                :

            Defendants      :

------------------------------------------------ x

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE AND MOTION TO PRECLUDE UNSUBSTANTIATED DEFENSE TAX CALCULATIONS

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Cynthia K. Dunne
Seetha Ramachandran
Assistant United States Attorneys
      -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

                :

    - v -                          07 Cr. 543 (KMK)

                :

YEHEZKEL ELIA and DAVID ELYAHO,  :

         Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE* AND MOTION TO PRECLUDE UNSUBSTANTIATED DEFENSE TAX CALCULATIONS

### Introduction

The Government respectfully submits this Brief in opposition to the defendants' motions *in limine* and in support of its motion to preclude the defendant Elia from offering into evidence unsubstantiated tax calculations.

### Summary

The defendants have moved to preclude evidence that is essential to the Government's ability to meet its burden of proof with regard to their fraudulent intent, namely, how they concealed their income and carried out a massive tax fraud over a multi-year period.  This evidence includes: (1) Elia's unsuccessful attempt to sneak $42,000 in cash out of the country to Israel and his false statements in connection with that money; (2) Elia's control over foreign bank accounts, while he annually attested on the tax returns that are the subject of this case that he had no such control; (3) Elia's personal expenditures for items such as the payment of his property taxes and his childrens' college tutitions -- many of which were paid by money order --  which sharply undercut his claim

1

that his businesses were losing money during the relevant time period; (4) evidence of uncharged crimes that are part and parcel to the defendants' scheme to defraud and to evade taxes; and (5) Elia's proffer statements, which it appears that he may contradict at trial. As explained below, the defendants' motions to preclude should be denied.

Second, Elia moves to preclude the Government from offering proof pertaining to his deceased accountant, Paul Lenok, because the Government did not comply with his eleventh hour discovery request for information from the tax files of Lenok's former 700 taxpayer clients – a discovery request that was denied by Judge Brieant in November, 2007. Similarly, Elia moves to preclude the Government from contesting his far fetched assertion that the Government's cooperator, Heidi Zherka, stole money from him by writing corporate checks to her friends (an assertion that he admits is a mere suspicion and which is highly improbable in a cash based business with cameras placed from every angle), because the Government has declined to comply with his discovery request for personal information about Ms. Zherka. Rather than seek a compulsion order, he seeks to preclude the Government from rebutting or contesting his unsubstantiated apparent defenses. Neither request is reasonable and the remedy sought is inappropriate. In fact, without more than a mere "suspicion" Elia himself should be precluded from asserting his far fetched and unsubstantiated allegations.

Finally, on May 23, 2008, the Government received defendant Elia's SneakerMania tax calculations for tax year 2002, which presumably will be offered through the testimony of his accountant, Jay Guneuth, and which concludes that Elia's business sustained a substantial loss in that tax year. Among other anomalies, the income tax calculations appear to be substantially unsupported by proof and should, therefore, be precluded at trial.

2

## POINT ONE
### Defendants' Motions to Preclude
### Relevant, Probative, Admissible Evidence Should Be Denied

### A.    The Seizure at JFK Airport

As was set forth in the Longo Declaration of January 31, 2008 (attached to the Government's Opposition to Pretrial Motions), on July 25, 2001, smack in the middle of one of the tax years charged in this Indictment, Elia was stopped by the United States Customs Service attempting to leave JFK Airport to travel to Israel with $43,992 in cash. Prior to boarding a plane to Israel, Elia falsely told Customs agents that he was carrying less than $10,000 in cash, however, they later discovered $43,992.00 in his bag.[1] Elia was allowed to leave the country with some cash and the balance of the cash ($42,000) was seized by Customs, as probable contraband. Elia thereafter filed a petition for the return of the seized cash in which he attested that the cash was generated by his legitimate businesses and to support that assertion, Elia provided Customs with tax returns from his driving school, to show his affiliation with a legitimate business. Customs thereafter fined Elia $5,000 for making a false statement and returned the balance of the money in the form of a $37,000 check. Records of Charles Schwab, in turn, indicate that on January 18, 2002, Elia deposited the $37,000 check (the check which represented the cash that he told Customs had been generated by his businesses) into a Schwab account that Elia maintains in the name of his Israeli national brother, Samyr. The Government anticipates that the proof at trial will include statements that Elia made to others about this event.

---

[1]  Contrary to counsel's characterization of the incident, Elia did not "fail to report" the money (Elia May 23, 2008 Br. at 12), but rather, Elia affirmatively and falsely represented to federal officials that he was taking less than $10,000 in cash out of the country.

3

In order to clarify the nature of the Government's proof on this incident, it is relevant that the Government does *not* intend to offer: 1) Elia's self-serving hearsay explanation about the cash that he offered to Customs to convince them that it was not contraband and to return some of the cash (and will object to the admission of such statement absent Elia's testimony); or 2) evidence of the fine that was levied upon him by Customs for making a false statement. The Government merely intends to offer proof that the defendant was caught at the border trying to sneak a bag of cash out of the country and that he lied about that cash – actions that, in the context of this case, are inconsistent with an innocent intent on the crimes charged, and actions that are highly probative of his intent.

Elia argues that the Government cannot establish that the cash seized at the border was cash generated from his businesses, however, he is wrong. The Government anticipates that the proof will show that during the relevant tax year, Elia made hundreds of thousands of dollars of cash income, which he failed to deposit into his corporate or personal bank accounts and which he hid in various locations including, among other places, foreign bank accounts and accounts that he maintained in the names of others. Certainly, cash is fungible and the Government will not trace a particular dollar to a particular store, however, the jury may easily infer that the money came from one of his businesses and that he lied about it because he did not want to create a record of the transaction. This inference is entirely reasonable in the context of the other proof in this case which will include his statements to others about the incident, his instruction to another in connection with an unrelated incident to structure cash deposits to avoid creating Currency Transaction Reports, plus his own conduct of daily traveling to multiple destinations to purchase numerous money orders in order to avoid the filing of currency reports. In the context of such proof, the jury easily could infer that Elia

4

was sneaking money out of the country to avoid being accountable for the large amounts of cash that his businesses were generating – money that he knew that he was not reporting to the IRS. Accordingly, Elia's motion to preclude this proof should be denied.

### B. **Paul Lenok – Elia's Deceased Accountant**

Elia moves to preclude proof pertaining to his deceased accountant, Paul Lenok, who signed most of the tax returns that are the subject of this case as the "tax preparer." Specifically, Elia moves to preclude proof of: 1) what Lenok said to investigating agents; 2) any third-party testimony of Lenok's good character; 3) Lenok having prepared Elia's tax returns in a competent, professional and/or honest manner; and 4) Lenok having prepared Elia's tax returns based upon information provided by Elia. Further, Elia has demanded the production of records from the IRS pertaining to Lenok's other clients.

### 1. **The First Three Preclusion Applications**

By letter dated May 2, 2008, the Government notified the defense that it will contend at trial that Paul Lenok and others are unindicted co-conspirators to the crimes charged in the Indictment. The Government does not intend to offer any testimony of what Lenok might have said to investigators, his good character or the honest manner in which he prepared the tax returns in question (issues one, two and three above). In fact, the Government anticipates that the proof will show that Lenok knew that he was preparing false tax returns, that he discussed the risks of filing such returns with Elia, but that he nonetheless went along with Elia's scheme – this was exactly why Elia continued to utilize his services. The documents produced in discovery and marked as evidence for trial conclusively demonstrate that Lenok knew that Elia's tax returns were false, as during the relevant time period he prepared financial statements and other documents for Elia that bore no

relation to the federal tax returns or the state sales tax returns that he prepared for Elia (and which more closely correlate to the Government's corrected tax figures). Although the Government will offer Lenok's statements to others about Elia's tax returns and Elia's state of knowledge during the course of the conspiracy, those statements are the statements of a co-conspirator and properly are admissible. FRE 801(d)(2)(E); *See e.g. United States v Russo*, 302 F.3d 37 (2d Cir. 2002).

### 2. The Fourth Preclusion Application

Elia also moves to preclude proof that Lenok prepared his tax returns based upon information provided to him by Elia – conduct that Elia admitted to in his proffer with the Government and proof that is consistent with other proof in the case. The tax returns for Elia's corporations tie out almost to the penny to the deposits and expenditures from Elia's corporate bank accounts. The deposits in those accounts are primarily the credit card company direct deposits into the accounts, and the expenditures are the checks that Elia wrote to offset the amounts deposited by the credit card companies – his earnings that could not be hidden. The Government anticipates that the proof will establish that Lenok mentioned to others in substance, among other things, that he had discussed Elia's potential exposure with Elia and the danger of preparing corporate tax returns based solely upon the bank statements. Based upon this and other proof, the jury could easily conclude that Elia was involved in the preparation of his tax returns, as he admitted in his proffer with the Government.

In Elia's proffer, he admitted that he provided his bank statements to Lenok annually, for the purpose of preparing his tax returns based upon the deposits and expenditures from his bank accounts and that he knew that the tax returns as prepared by Lenok were not accurate. Accordingly, if Elia argues at trial that he did not know that the tax returns were false and/or that he had no

6

dealings or discussions with Lenok about those returns and/or that he did not provide Lenok with the bank statements annually for the purpose of preparing his returns based upon his deposits and expenditures from his corporate accounts, then his own proffer admissions should come into evidence under the terms of the proffer agreement.

### 3. Elia's Discovery Request

Finally, Elia appears to move to preclude testimony pertaining to Lenok because the Government has not responded to his discovery requests for: 1) the results of all tax returns of any of Lenok's 700 clients who were ever audited or under investigation; 2) Special Agent's reports pertaining to Lenok; 3) all of Lenok's statements to the IRS pertaining to any of his clients. The Government has declined to comply with this burdensome request, and in fact, Judge Brieant already denied this same application at the November 13, 2007 pretrial conference in this case. (Excerpt of Minutes attached as Exhibit A).

The Government has opposed this application from the outset and has urged Elia's counsel to obtain Mr. Lenok's client files from Mr. Lenok's representative and to examine those files in their entirety, if he truly believes that such files will provide him with information relevant to his defense. (See Exhibit B, Government letters dated May 15 and May 20, 2008). Without reason to believe that the retrieval of such files would yield relevant information or could not be more easily retrieved from other sources, the Government was unwilling to comply with Elia's renewed eleventh-hour request which would involve: pulling approximately 700 taxpayer transcripts of account; analyzing 700 transcripts (which are written in a computer code language) to determine if any of the 700 taxpayers were ever audited or under criminal investigation; retrieving from storage and/or the field the audit and/or criminal investigation files for any clients that had been audited or investigated; and then

7

looking for correspondence or evidence of IRS communications with Mr. Lenok. This kind of internal fishing expedition could take weeks or months to complete and any such information discovered in this manner would implicate taxpayer privacy and disclosure laws and/or could jeopardize past or current criminal investigations. Accordingly, the Government respectfully submits that absent some credible reason to support this fishing expedition, there are other means for Elia to obtain the information he is looking for -- if such information exists. His apparent refusal or inability to articulate the basis for burdening the Government with this task suggests that it is a non-issue.

In fact, Elia relies upon the Government's summation in a different case to support his renewed demand for the files of 700 taxpayers from the Government. In the case cited, the accountant was alive and testified at trial, the defendant had not proffered an admission to his role in the crime, and counsel apparently tried to argue to the jury that the accountant, acting alone, was responsible for the tax fraud – a defense that is not available to Elia in this case because of his proffer.

If Elia truly believes that he will find exculpatory proof that will not contradict his client's proffer, then he has alternate places to look for such proof, without asking the Government to retrieve files that are not readily accessible and that are subject to taxpayer privacy laws and restrictions. Finally, if Elia's primary concern is whether the Government will offer positive evidence about Lenok, then the application is moot -- as he should have gathered when notified that the Government will contend that Lenok was an unindicted co-conspirator, and as was surmised by Judge Brieant when he ruled on this application in November, 2007. Either way, even if it were not the law of the case, the motion to preclude nonetheless should be denied, to the extent that it seeks

8

to preclude Lenok's statements to others during the course of the crimes charged, or to preclude the observations of others, or to the extent that it is inconsistent with Elia's proffer. (See Point I of Govt. Br. May 23, 2008).

### C. Information Pertaining to Ms. Zherka

Elia moves to preclude the Government from challenging his unsubstantiated "suspicion" that Ms Zherka, a cooperating witness, stole money from Elia's companies by writing corporate checks to her friends, unless the Government provides Elia with the cellular telephone numbers that Ms. Zherka utilized during the relevant time periods. Elia incorrectly characterizes the Government's objection to his discovery request, by quoting only part of its response. (Elia May 23, 2008 Br. at 9). The Government asked counsel to provide further details to support his "suspicion" that Ms. Zherka stole from Elia by writing corporate checks to her friends – a most improbable way to steal from a company that does such a substantial cash business – so that it could evaluate whether disclosure of Ms Zherka's personal information was warranted. Elia has declined to identify what checks or vendors payments he finds "suspicious."

There is no basis for the Government to provide Elia with personal information pertaining to its witness that would enable him to contact the people who Ms. Zherka called during on her personal cell phone during the relevant time period – if such phone records even still exist.[2] The Government offered to undertake an investigation to determine if there is any truth to his "suspicion," however, Elia does not want to divulge the basis of his alleged suspicion. Elia has

---

[2] Often cellular phone records are destroyed after a period of 90 days to two or three years, depending upon the provider. The Government has asked Ms. Zherka to check how long her provider maintains such records and on information and belief, they only maintained such records for a period of one year, which would render Elia's application for her personal identification information moot.

refused to provide any supporting details about his alleged suspicion and yet, he has continued to request that the Government, based upon his "suspicion," divulge personal information about Ms. Zherka. Based upon the current record, Elia should be precluded from insinuating ,suggesting or questioning Ms. Zherka about any allegedly suspicious transactions, as they lack any factual basis. *See e.g., Hynes v. Coughlin*, 79 F. 3d 285, 293-94 (2d Cir. 1996)(FRE 608(b) requires a good faith basis for question on cross examination; court has discretion under Rules 608 and 403 whether to permit questioning); *United States v. Concepcion*, 983 F.2d 369, 391-92 (2d Cir. 1992)(trial judge may preclude questions "for which the questioner cannot show a good faith basis") .

Furthermore, relevant information pertaining to the allegedly suspicious checks – if there is any relevant information – is more readily available to Elia than the Government.[3] Elia knows what transactions allegedly appear suspicious to him, he has access to his checks, and he can readily identify the recipient of the alleged stolen monies and where the suspicious check or checks were negotiated. In the absence of proof or details supporting Elia's far fetched claim that while Ms. Zherka was working for him she stole money by writing checks to her friends (during a time period when Elia was watching every penny spent, installing security cameras and accusing employees of stealing money from him), and in the absence of a sworn statement by Elia that he does not already have the information that he is seeking to have the Government produce, the motion should be denied and Elia should be precluded from inferring any such wrongdoing by Ms. Zherka.[4]

---

[3] Curiously absent from Elia's papers is Elia's assertion that he does not already have Ms. Zherka's cell phone numbers. After Ms. Zherka stopped working for Mr. Elia she continued to collect the rents from his buildings and to deliver those payments to him monthly. Ms. Zherka was someone with whom Elia had constant contact during the relevant period.

[4] Elia incorrectly states that the Government's proof "depends upon whether it can prove that Elia purchased such additional money orders that he did not use for inventory or the businesses."

### D. **Elia's Control and Use of Foreign Bank Accounts Is Relevant and Admissible**

#### 1. **Counsel's Admissions are Binding**

Counts Twenty-Five through Twenty-Eight of the Indictment charge Elia with subscribing to false individual tax returns. The Government has notified Elia that one of the ways it intends to prove these individual subscription counts is by showing that Elia falsely stated, on each of his personal tax returns, that he had no control over foreign bank accounts, when in truth and fact, he controlled foreign bank accounts in Israel. (*See* Exhibit C). Accordingly, evidence that Elia controlled foreign bank accounts, including bank accounts held in the name of his brother, Samyr Elia, is clearly relevant and admissible. Remarkably, Elia admits his guilt on Counts Twenty-Five through Twenty-Eight, stating in his brief stating "The Israeli bank account balances are not only in relatively unremarkable amounts, but, more important, *these bank accounts are jointly owned by Elia and members of his family living in Israel.*" (Elia May 23, 2008 Br. at 11) (emphasis added).

Elia's admission to the Court that he controlled foreign bank accounts during the relevant time period is binding and admissible against him. In *United States v. McKeon*, 738 F.2d 26, 30-32 (2d Cir. 1984), the Second Circuit held that an opening statement made by defense counsel at the defendant's second trial was admissible against the defendant during his third trial. The Court reasoned that such admissions are analogous to pleadings in civil cases, which are admissible as party-admissions. The Court in *McKeon* explained, "A party thus cannot advance one version of the

_____

(Elia May 23, 2008 Br. at 9) (emphasis removed). The Government's case does not depend upon how many personal expenses Elia paid by money order. The Government anticipates that the proof will show that Elia purchased money orders to pay large bills that he could not pay in cash. For example, he paid his homeowner's insurance, Boston University, and other educational institutions with money orders. The Government does not contend that the money order transactions are Elia's only cash transactions. In fact, the Government anticipates that witnesses will testify that Elia was known to tote around hundreds of thousands of dollars of cash for numerous personal transactions.

facts in its pleadings, conclude that its interests would be better served by a different version, and

amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn

of the change in stories." *McKeon*, 738 F.2d at 31 (citing *Contractor Utility Sales Co. V. Certain-

Teed Products Corp.*, 638 F.2d 1061, 1084 (7th Cir. 1981); *Raulie v. United States*, 400 F.2d 487,

526 (10th Cir. 1968)).  Here, the analogy is even more persuasive – Elia's admissions in pleadings

filed in support of his argument to exclude certain evidence at trial should be admissible at that same

trial.  Accordingly, the Government intends to offer into evidence at trial a redacted version of page

11 of Elia's May 23, 2008 brief in support of Counts Twenty-Five through Twenty Eight of the

Indictment.

### 2. Proof of Elia's Bank Accounts is Admissible

In addition to the individual subscription counts, Elia's control and use of foreign bank

accounts in Israel in his family members' names is also highly probative proof of his scheme to

conceal his income and to evade the payment and collection of his taxes.  As explained above in

Point I.A, the Government anticipates that the proof will show that Elia made hundreds of thousands

of dollars of cash income, which he failed to deposit into his corporate or personal bank accounts,

but instead, hid in various locations including foreign bank accounts and accounts that he maintained

in the names of others.  This proof will include, among other things, the following:

- Documents and testimony spanning throughout the relevant tax years, that show that Elia invested approximately $1,000,000 in cash that originated from the safe in his corporate office.  Some investments were made in the name of his brother, Samyr Elia, and others were changed to Samyr's name.

- Bank records that show Elia's transfer of substantial sums of money to a bank account in Israel.

12

- Elia's admission that an investment account that he maintained in the name of his brother Samyr, an Israeli citizen, was in truth an fact, his own investment, account and asset.

- English translations of Hebrew documents found during a search of Elia's offices that reflect Elia's communications with banks in Israel, including Union Bank and Bank Leumi, regarding withdrawals, transfers, and authorizations for withdrawals from the accounts in Israel.

- A letter produced by Union Bank of Israel (through its counsel), stating that Elia maintained an account at Union Bank in Israel which was closed in 2001.[5]

Viewed together, this evidence supports the conclusion that Elia used foreign bank accounts and accounts held in the name of others to conceal the cash income that he obtained from his businesses during the charged tax years. As such, it is admissible as proof of Elia's intent and his attempted method of concealment of the crimes charged.

### E.    Elia's Personal Expenditures and Methods of Payment are Relevant and Admissible

Elia appears to assert that the Government should be precluded from offering proof of his payment of large personal expenses by money orders and that it also be precluded from offering proof of his purchases of numerous luxury automobiles during the relevant tax years, when he was claiming losses on his tax returns. The Government anticipates that the proof will show that Elia paid many of his large personal bills through a collection of small money orders, all purchased in small denominations that would not trigger the filing of currency transaction reports. Elia paid large personal items such as college tuitions, private school tuitions, life insurance, homeowner's insurance and property taxes for his personal residence in exactly the same manner that he paid the majority of his business expenses, in a manner designed to avoid depositing the cash into his

---

[5] The Government has given defense counsel a proposed stipulation to admit this document at trial without authentication by a document custodian, and is currently waiting for a response.

personal or corporate bank accounts and to attempt to insure that the income represented by these transactions would not be accountable to him. This highly relevant proof is central to the Government's case and therefore, naturally prejudicial, because it is inconsistent with the specious defenses that Elia appears to want to advance.

The Government anticipates that the proof will show that both Elia and Elyaho took cash from their businesses on a nearly daily basis, recorded their cash draws in "Hezi's book" and "David's book" and failed to deposit the cash into their personal or corporate bank accounts. Evidence that Elia paid significant personal expenses (like college tuition, taxes, and life insurance that typically cannot be paid in large denominations of cash) by cobbling together money orders in small denominations shows his effort to conceal the source of the money that he used to pay those expenses. Moreover, the fact that Elia was purchasing luxury cars and paying for other big-ticket personal expenses by money order is relevant because it provides proof that he was, in fact, making money during the tax years when he was reporting to the IRS losses or minimal income. In fact, the Government anticipates that the proof will demonstrate that Elia's s reported wages could not even cover the personal expenses that are traceable to his personal money order purchases – not to mention the hundreds of thousands of dollars of cash transactions about which there will be trial testimony. (*See* Exhibit D, Draft Summary Chart of Elia's Personal Expenditures).

While Elia claims that "it is not unreasonable to expect that a businessman in his fifties might well have access to cash from other sources," (Elia May 23, 2008 Br. at 13), it is far-fetched to conclude that a businessman in Elia's position, who was purportedly suffering losses year after year (inclusing for years before the charged time period) and whose personal bank accounts never reflected significant balances, would have hundreds of thousands of dollars in cash from other

legitimate sources to draw upon. Assuming, *arguendo,* that Elia had some mystery source of cash apart from the unreported cash income that he was seen siphoning out of his businesses on a daily basis and that he went to such extreme measures to avoid reporting to the IRS, his payment of large expenses by money order and his purchases of luxury items while his businesses were apparently failing year after year and when he had no money in the bank, is not consistent with the actions of a person sustaining such losses. Indeed, to the extent that there is any prejudice to Elia because the purchases suggest a privileged lifestyle, that prejudice is outweighed by the probative value of the fact that the amounts paid out exceed his income reported, as this is after all, a case where the defendant is charged with evading his taxes by concealing his tremendous cash income. *See, e.g.,* *United States v. Daniels*, 617 F.2d 146, 150 (5th Cir. 1980) (evidence that a defendant spent large amounts of cash to avoid keeping records of his expenditures established willfulness in a tax evasion case); *United States v. There'll*, 390 F.Supp 371, 375-77 (S.D.N.Y. 1975) (evidence of defendant's purchases of large number of expensive automobiles and purchase of home and payment of home improvement during charged tax years established that defendant had substantial income on which substantial taxes were due). Accordingly, Elia's motion to preclude this proof should be denied.

### F.    Evidence of Elia's Uncharged Crimes are Not Prejudical to Elyaho

Elyaho moves to preclude evidence of uncharged crimes committed by Elia – namely structuring cash transactions to avoid placing the money into corporate bank accounts and sneaking cash out of the country – as he contends that such conduct will unfairly prejudice him at trial. That argument should be rejected for essentially the same reasons that the Court denied Elyaho's severance motion earlier this year. Because both defendants are alleged to have participated in a common scheme or plan, the so-called prejudicial evidence would be admitted

15

against Elyaho even if he were tried separately. *See, e.g., United States* v. *Locascio*, 6 F.3d 924, 947 (2d Cir. 1993) (denial of severance upheld where defendant "did not identify any evidence introduced that would have been inadmissible at a severed trial."). As the Second Circuit has explained:

> A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately. Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.

*Rosa*, 11 F.3d at 341 (citations omitted).

Even if this evidence were only admissible against one defendant, raising the possibility of prejudice, the Second Circuit has routinely found a trial judge's instructions sufficient to avoid infliction of injury. *See, e.g., United States* v. *Joyner*, 201 F.3d 61, 75 (2d Cir. 2000) ("[a]ny possibility of prejudicial 'spillover'" eliminated by several general instructions to the jury "to consider each defendant's guilt separately"), *decision clarified and reh'g denied*, 313 F.3d 40 (2d Cir. 2002); *Salameh*, 152 F.3d at 116-17 ("any possible prejudice was eliminated by the district court's repeated admonitions to the jury that each defendant's guilt had to be separately and individually considered"); *United States* v. *Bari*, 750 F.2d 1169, 1178 (2d Cir. 1984) ("the district court carefully instructed the jury to consider the acts of each defendant distinctly in deciding his role in the conspiracy"); *United States* v. *Aloi*, 511 F.2d 585, 599 (2d Cir. 1975) (relying on instruction to consider the acts of each defendant distinctly to affirm denial of severance); *see also Richardson* v. *Marsh*, 481 U.S. 200, 206 (1987) (citing the "almost invariable assumption of the law that jurors follow their instructions").

With respect to the structuring evidence (which pertains primarily to the expenses of SneakerMania), however, the Government anticipates that the proof will show that the method that the defendants Elyaho and Elia ran the business of Final Touch Jewelry was not all that dissimilar to SneakerMania  – it was just a variation on the theme of failing to deposit cash earnings and payment of vendors by means other than check.  In the case of Final Touch, a small kiosk located at the Cross County Shopping Center, David collected the cash on a daily basis, paid his vendors with cash, and then split the profits daily with his brother, Elia.  The fact that SneakerMania vendors primarily were located out of state and, therefore, their payments had to be mailed to distant locations required Elia to pay them through a collection of money orders in small denominations –  in order to avoid depositing the cash into his corporate bank accounts, which was the exact same goal of Elyaho and Elia's joint Final Touch scheme.   Further, the proof will show that Elyaho often assumed Elia's repsonsibilities, and collected Elia's daily cash earnings from his various stores on occasions when Elia was unavailable or out of the country.  As such, the purchase of money orders was merely a variation on the scheme that Elyaho himself employed in connection with the Final Touch business and therefore, he cannot credibly argue that it is overly prejudicial to his case.

Similarly, evidence that Elia was stopped on July 25, 2001 – during one of the charged tax years – by the United States Customs Service attempting to leave JFK Airport to travel to Israel with $43,992 in cash, and falsely told Customs agents that he was carrying less than $10,000 in cash, is powerful evidence that he was in fact concealing cash income during the charged tax years by hiding cash in places that include foreign bank accounts.  Elyaho was a significant participant in Elia's scheme to conceal cash income – he took cash from Final Touch

17

Jewelry, failed to deposit it, and occasionally collected cash for Elia. Elyaho does not suffer spillover prejudice because the evidence shows that Elia's attempt to sneak cash out of the country was part of a larger scheme in which Elyaho participated.

### G. **Admitting Elia's Proffer Statements Will Not Raise _Bruton_ Issues**

Elyaho objects to the introduction of Elia's proffer statements because (1) he claims that the Government did not provide him with timely notice of potential *Bruton* issues; and (2) to the extent that they inculpate Elyaho, they justify a severance, or in the alternative, should be redacted to eliminate *Bruton* issues.

Elyaho was provided with ample notice of Elia's proffer to the Government and its content, as the agent's notes were first produced to the defendants on or about December 20, 2007. Because the statements made by a defendant during a proffer with the Government are not admissible as part of the Government's case in chief, the Government did not anticipate offering these statements when Judge McMahon ordered the Government to notify the defense of statements it intended to offer at trial. Only recently has Elia suggested through correspondence and in his motion *in limine*, that he may raise arguments at trial that contradict his proffer statements. Even now, the Government only intends to offer Elia's proffer statements if he does in fact contradict those statements during trial, and therefore, in an abundance of caution requested an *in limine* ruling on this issue, to alert the court of the potential issue.

Second, any *Bruton* issues that might arise from the admission of Elia's proffer statements at trial can be eliminated by simply preparing the witness to eliminate any reference to Elyaho

when if the Government finds it necessary to elicit such testimony.[6]  The two areas identified in

the Government's May 23, 2008 brief that pertain to Elyaho were Elia's statements that:

> (1)    Elia agreed to split the cash profits from Final Touch Jewelry with his brother,
> defendant David Elyaho.  The cash split is recorded in David's book, which details
> their daily cash draws from that business;

> (2)    Elia gave David Elyaho a small salary and a W-2 from PizzaMania so that David
> could get health insurance for his family on the group plan.

If Elia's counsel were to contend at trial, for example, that Elia did not receive cash income from

Final Touch Jewelry, then the Government might seek to offer Elia's contrary admission to such

in his proffer.  If the Government is faced with that unlikely possibility, then the witness would

testify in a manner that avoids implicating Elyaho, and the Government would first notify the

Court and Elyaho about how it anticipates the testimony would be presented, to ensure that the

presentation did not implicate *Bruton* issues.  *See Richardson v. Marsh*, 481 U.S. 200 (1987)

(redaction of the co-defendant's statement to eliminate any reference to the defendant is

sufficient to eliminate any *Bruton* problem); *United States v. Tutino*, 883 F.2d 1125, 1135 (2d

Cir. 1989) (affirmed a conviction based in part on a statement of a co-defendant that was

redacted so that it referred to "others," "other people," and "another person."); *United States v.

Edwards*, 159 F.3d 1117, 1125-26 (8th Cir. 1998) (co-defendants' names replaced with neutral

pronouns such as "we," "they," "someone," and "others"); *United States v. Smith*, 918 F.2d 1032,

1038 (2d Cir. 1990) ("As the statements are not 'facially incriminating' as to Smith and were

---

[6] Elia's proffer statements would be offered through testimony from now-retired IRS Special
Agent Herbert Eis.  The Government would instruct Agent Eis to avoid any reference to these two
statements during his testimony.

accompanied by an appropriate limiting instruction, there was no error.") (citing *Alvarado*, 882 F.2d at 652-53).

**POINT TWO**
**<u>Elia Should Be Precluded From Offering Unsubstantiated Tax Figures</u>**

On May 23, 2008,  Elia's counsel produced the proposed corporate tax figures for tax year 2002 that his expert witness will present at trial.  These figures pertain only to one entity and one year – SneakerMania 2002 –  and from the submission it appears that Elia will be conceding at trial that his corporate tax returns were false, as the figures bear no relation to the tax returns filed by Elia.  The figures utilized by Elia's accountant are remarkably and substantially similar to the Government's tax figures but with one large exception –  Elia's accountant utilizes a figure for the "cost of goods sold" that is more than $400,000.00  higher than the Government's figures.[7]  The Government obtained its cost of goods sold by totaling and reconciling invoices from vendors, checks disbursed by Elia's companies  and money orders purchased by Elia.

In pretrial proceedings, Elia asserted that the Government's tax calculations were missing hundreds of thousands of dollars of his corporate expenses and sought an adjournment so that he could gather proof of these additional expenditures.  In fact, Elia represented to Judge Brieant that he was issuing subpoenas to all of his vendors, to prove that the Government's cost of goods sold figures are incorrect.  Having failed to respond to the Government's repeated requests for reciprocal discovery, Elia was directed by Judge Brieant to produce to the

---

[7]    In the case of a retail establishment like SneakerMania, the "cost of goods sold" figure reflects the cost of the retail establishment's inventory – the actual cost to the company for the items that the store sells to the public.

20

Government copies of the "voluminous" records that he claimed to be gathering through his defense investigation.

In April 2008, Elia produced only 54 pages of documents, a handful of invoices and vendor records, which the Government already had credited to him in its tax calculations and which were among the records of purchases already produced in discovery. Absent tangible proof of the additional $400,000.00+ of corporate expenditures that it appears that Elia will claim, Elia should be precluded from offering expert testimony that is based upon nonexistent payments to vendors.

## **Conclusion**

For the foregoing reasons, the defendants' motions should be denied.

Dated:  White Plains, New York
        May 30, 2008

                            Respectfully submitted,

                            MICHAEL J. GARCIA
                            United States Attorney


                    By:  ___/s/  Cynthia K. Dunne___
                            Cynthia K. Dunne
                            Seetha Ramachandran.
                            Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

Michelle Smith Brown, deposes and says that she is employed in the Office of the United States Attorney for the Southern District of New York.

That on May 30, 2008, she served a copy of the attached Government's Sentencing Memorandum by ECF and Fed Ex:

Jared Scharf, Esq.
1025 Westchester Avenue, Suite 305
White Plains, NY 10604

Joseph A. Vita, Esq.
327 Irving Avenue
Port Chester, NY 10573

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. Section 1746.

/s/ _____
{NAME}

Executed on:  May 30, 2008
White Plains, New York

22

# EXHIBIT
# A

1

7bdielic ag                          CONFERENCE

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                              07 Cr. 543 CLB

5   YEHEZKEL ELIA and
    DAVID ELYAIO,
6
                Defendants.
7
    ------------------------------x
8
                                        November 13, 2007
9                                       10:00 a.m.
                                        White Plains, N.Y.
10
    Before:
11
                        HON. CHARLES L. BRIEANT,
12
                                        District Judge
13
                        APPEARANCES
14
    MICHAEL J. GARCIA
15       United States Attorney for the
         Southern District of New York
16  CYNTHIA DUNNE
         Assistant United States Attorney
17
    JARED SHARF
18  ADAM SHARF
         Attorney for Defendant Elia
19
    JOSEPH VITA
20       Attorney for Defendant Elyaio

21  PATRICK LONGO, IRS

22

23
                        CONFERENCE
24

25

7bdielic ag                    CONFERENCE

1        MR. A. SHARF:  He was the original preparer and

2   accountant for Yehezkel.

3        MS DUNNE:  The records of Paul Lenick have been

4   produced in discovery.  I don't know of any entitlement to our

5   work product analysis of those records.  However, I will state

6   for the Court's edification, Paul Lenick died.  The records

7   speak for themselves.  And Mr. Lenick unfortunately passed

8   away.  But the records that were produced prior to his death

9   were made available in discovery.

10       MR. A. SHARF:  May I have just a brief moment?

11       THE COURT:  Sure.

12       (Pause)

13       MR. A. SHARF:  Your Honor, we're also looking for the

14  audit adjustments for Paul Lenick's other clients.

15       THE COURT:  No.  You can assume he's a crook.  It

16  doesn't make a difference, does it?  The client signed the

17  returns.

18       MR. A. SHARF:  To see if there's a history or theme in

19  Paul Lenick's work.

20       THE COURT:  Not ordering it.  There probably is.

21  Probably lots of thievery.

22       I'm not satisfied with what's going on.  I've tried to

23  get it back on track.  I think the best thing to do is to

24  extend the matter for a month and have you come back and tell

25  me how you stand with what you need.  And by that time I expect

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

May 15, 2008

**BY FAX**

Jared Scharf, Esq.
1025 Westchester Avenue, Suite 305
White Plains, New York 10604

**Re: US v Elia and Elyaho**
07 Cr 543 (KMK)

Dear Mr. Scharf:

This letter responds to your various recent discovery requests.

**Paul Lenok**

This Office has attempted to determine if there is any information relevant to your request for information pertaining to dead accountant and tax preparer Paul Lenok and his clients (requests 1, 2, 5 and 6 of your May 7 letter). I have been advised that the IRS only maintains computerized preparer information for three years and that it does not cross-reference its audits, correspondence or witness interviews by tax preparer. In addition, retrieval of Lenok's records is further complicated because apparently he did not file returns using his tax preparer identification number. Accordingly, retrieval and review of Lenok's client documents -- that may or may not have responsive information -- could take weeks and possibly longer. Since neither the dead accountant nor his other clients are on trial and since Lenok, obviously, will not be testifying, we believe that any such information would not be relevant. Accordingly, absent a court order, the IRS will not be retrieving and reviewing the transcripts and underlying tax records of the 700 individual and corporate taxpayers whose tax returns were prepared by Lenok. If you believe that Mr. Lenok authored correspondence that is relevant to your defense or that he engaged in conduct that is material to your defense, then I suggest that you contact his other clients and/or subpoena his files from his representatives.

## Juror Tax Return Information

This Office will not be providing you with tax return information pertaining to potential jurors. If you have specific questions about a juror's potential bias, then those questions should be included in a proposed voir dire. As you well know, defendants were once entitled to an indication (simply a "yes" or "no") whether prospective jurors had been the subject of an audit or tax investigation (through the former version of 26 U.S.C. Section 6103(h)(5)), but they no longer are, by virtue of the Taxpayer Relief Act of 1997 (P.L. 105-34, effective August 1997), which deleted that provision.

## Former Special Agent Herbert Eis

You have requested contact information for former Special Agent Herbert Eis. We have contacted Mr. Eis and he has not authorized us to provide you with his personal contact information. If you are looking for Mr. Eis in order to serve a trial subpoena, then we may be able to assist you by arranging for him to receive a subpoena, however, as you know Mr. Eis no longer works for the Internal Revenue Service. Please provide us with further information so that we can determine if we can assist you.

## Ms. Zherka

We will not be providing you with personal information regarding Ms. Zherka. If you provide us with specific instances of alleged theft and/or embezzlement, then we will investigate the matter, however, without cause shown, we will not facilitate a fishing expedition into the details of her personal life.

## Government Exhibits

Before sending out the Government Exhibits for scanning I offered you and Mr. Vita with the choice of having the documents in either "pdf" or "tiff" format. In addition, before sending the exhibits out, I confirmed with both you that you would accept

the exhibits in "tiff" format.  Accordingly, if at this point you
would like to have the documents converted into another format,
then you should have your client arrange for such.


                    Very truly yours,

                    MICHAEL J. GARCIA
                    United States Attorney


              By: _____
                    CYNTHIA K. DUNNE
                    SEETHA RAMACHANDRAN
                    Assistant United States Attorneys
                    (914) 993-1913


Enclosure

cc: Joseph A. Vita, Esq. (by fax)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

May 20, 2008

**BY FAX**

Jared Scharf, Esq.
1025 Westchester Avenue, Suite 305
White Plains, New York 10604

**Re: US v Elia and Elyaho**
07 Cr. 543 (KMK)

Dear Mr. Scharf:

This letter responds to your various recent discovery requests.

**Paul Lenok**

As stated in our prior correspondence, absent a court order we are not going to research and pull the client files of Lenok's 700 individual and corporate taxpayer clients to determine if any ever were audited or under investigation. As stated previously, your request would take weeks to complete and we have no basis to believe that there is any information relevant to your defense in any of Lenok's client's files that you cannot get from other means. As stated previously, if you truly believe that Lenok's client files will contain information helpful to your defense, then we suggest that you subpoena Lenok's files from his representatives and/or from his other clients. While you state in your May 16 letter that you "believe that investigating agents ... may have inquired into Mr. Lenok's conduct by determining examination results for his other clients," we know of no such examination. Please provide us with more detail about the basis of your purported belief so that we may independently investigate your allegation; otherwise, we will continue to consider your request an unduly burdensome fishing expedition.

Further, you have requested copies of all records which this Office obtained from Mr. Lenok. I have been advised by the case agents that your representatives reviewed all such files in the course of discovery. In fact, some of the Lenok documents that you requested in your May 16 letter are marked as trial exhibits

and are among those records which were produced among the computerized discs of trial exhibits. If you would like to inspect the original Lenok records again (absent those that have been marked as trial exhibits which have been produced to you), then you may make such arrangements with paralegal Sherill Doar, who can be reached at (914) 993-1920.

**Ms. Zherka**

For the reasons set forth in our prior correspondence, we will not be providing you with personal information regarding Ms. Zherka. We have asked you to provide details substantiating your allegation that Ms. Zherka embezzled funds so that we can investigate your allegation, however, you have declined to provide details to support that allegation. In the absence of such detail, we will continue to consider your request an unsubstantiated fishing expedition.

If you truly believe that Ms. Zherka wrote corporate checks to her friends, then you easily should be able to establish that allegation with or without the Government providing you with Ms. Zherka's personal information. Further, we note that it seems quite improbable that your client does not already have such information.

**Juror Information**

As you know, this Office does not compile -- and has not complied - tax information pertaining to potential jurors.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

By: _____
CYNTHIA K. DUNNE
SEETHA RAMACHANDRAN
Assistant United States Attorneys
(914) 993-1913

cc: Joseph A. Vita, Esq. (by fax)

# EXHIBIT
# C



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

May 2, 2008

Jared Scharf, Esq. (BY HAND)
1025 Westchester Avenue, Suite 305
White Plains, NY 10604

Joseph A. Vita, Esq. (BY FEDERAL EXPRESS)
327 Irving Avenue
Port Chester, NY 10573

> Re:  United States v. Elia and Elyaho, 07 Cr. 543 (KMK)

Dear Counsel:

**Items Produced**

1. Pursuant to the Court's instruction, enclosed are copies of the Government's proposed trial exhibits and an updated exhibit list. The majority of the records have been scanned, and with your consent they are produced on discs rather than by hard copies. As with any copy job there may be some glitches in some of the scanning and we will work with you to make any corrections that are necessary. As you know, some of the bank records have not been copied in their entirety as they are voluminous and the most relevant checks have been extracted and marked separately. In addition, hard copies of Exhibits 400 through 428 were produced to you last week (the Hebrew documents with translations). The originals of all trial exhibits are available for your inspection at any time.

2. Also enclosed are the Government's Requests to Charge and its Proposed Voir Dire.

3. In the course of preparing witness folders we discovered several statements that defendant Elyaho made to law enforcement agents on the day of

1

the Government's execution of the search warrants at Sneakermania, Final Touch Jewelry, and Sport Stop. These statements, which Elyaho made to law enforcement agents when they (1) arrived at Elia's home to get a key to the Sneakermania store; and (2) executed the search warrant at Sneakermania, are enclosed, Bates stamped 64423 through 64427.

4. Although agent notes of the proffers of Elia have been produced previously, enclosed are AUSA notes of the Elia proffer of December 19, 2005, Bates stamped 64428 through 64432.

5. Enclosed is the CV of the Government's expert, Revenue Officer Frank Stamm, Bates stamped 65094. The Government anticipates that Revenue Officer Stamm's testimony will explain and highlight material false statements in the corporate tax returns (the inaccurate reporting of cash receipts and expenses of the corporation), the material false statements in Elia's individual income tax returns (failure to properly report income and concealment of his control over foreign bank accounts). Revenue Officer Stamm's testimony will also explain and summarize the tax loss calculation. The Government also anticipates offering various summary charts through Revenue Officer Frank Stamm, and will produce draft charts as they are completed. Once finalized, those charts will be marked as trial exhibits. As you know, the Government will continue to make adjustments to the tax figures and may create additional charts as we get nearer to trial and as trial proceeds. In accordance with our continuing discovery obligations we will continue to provide you with updated summary charts.

6. We anticipate that as many as six Postal employees may testify at trial that they know the defendant Elia because he came daily to their Postal windows over a period of years to purchase money orders. All six Postal employees were shown the enclosed photograph and identified Elia as the person that they know as Elia. Three Postal employees were shown the enclosed picture of Elyaho and were not able to identify him and none of the Postal employees will identify Elyaho at trial. The pictures of Elia and Elyaho that were shown to Postal employees are enclosed and Bates stamped as 64421 and 64422.

7. In accordance with our continuing discovery obligations enclosed are bank records recently received from Washington Mutual Bank, Bates stamped 64428 through 65093. Also enclosed are documents recently received from Joyce Equities, Inc., Bates stamped 65095 through 65112.

8.  In addition, this is to advise you that the Government will contend at trial that both Harjria Zherka ("Lilly") and Paul Lennox are unindicted co-conspirators to the crimes charged in the Indictment.

9.  Further, in an excess of caution and to eliminate any claim of surprise, please be advised that the Government will contend at trial that Elia's individual tax returns were false for the reasons specifically listed in the Indictment and also because of Elia's affirmative representation that he did not have any interest or signature authority over any financial accounts in a foreign country.  See Elia Individual Tax Returns, Schedule A &B, Part III.

## Evidence of Intent and Practice

The Government's July 28, 2008 discovery letter set forth its initial 404(b) notice.  As stated in that letter, the Government anticipates that its direct case will include proof that defendant Elia used numerous corporate vehicles to conceal the cash that was generated by his businesses.  Specifically, in addition to the corporate entities charged in the Indictment the government will contend that Elia also used Sports Stop, Cross County Electronics and Photo Express to hide his cash earnings.  The Government will contend that all of Elia's businesses operated in exactly the same manner as the corporations that are the subject of the criminal case.  In addition, the Government anticipates that it may offer proof that Elia used the White Plains Driving School to help hide the cash generated from his businesses.  The Government will contend that Elia used his corporate entities before and during the relevant time period in order to hide and to conceal his sources of income and the extent of his expenses and to otherwise attempt to defeat or thwart the orderly collection or determination of his tax liability.

Similarly, the Government will contend at trial that Elia's purchases of money orders was both an overt act in furtherance of the crimes charged and evidence of his intent, namely to conceal receipts and income and the extent of his purchases.

In addition, the Government will offer proof of Elia's failed attempt to take cash out of the country (the Customs stop) and will contend that such attempt was an overt act and evidence of his intent relating to the crimes charged.

Similarly, the Government anticipates that it will offer proof that Elyaho not only participated in the Final Touch Jewelry business, but he also filled in for Elia, when Elia went out of town.  At those times, among other things, Elyaho travelled from store to store daily to collect the cash generated at each store.  The

Government will offer this proof as evidence of Elyaho's knowledge and intent and also as evidence of the existence of the conspiracy.

The Government anticipates that the proof will establish both Elia and Elyaho engaged in the exact same conduct as that charged in the Indictment for many years before the tax years charged.

To the extent that any of the above conduct began prior to the tax years charged, such evidence will be offered in part as background to the crimes charged and also as evidence of the defendants' intent during the relevant time period. Accordingly, although not 404(b) evidence, such evidence is identified at this time, in case you wish to make any application you deem appropriate.

## Stipulations

Pursuant to your representation that you will likely stipulate to the authenticity of majority of the documents, we are in the process of preparing proposed stipulations for your review. We will send the stipulations for your review some time next week.

## Request for Reciprocal Discovery

Finally, we have not received any reciprocal discovery pertaining to your expert witness. In addition, in accordance with your continuing discovery obligations and the Court's direction to turn over reciprocal discovery, please provide us with any additional documents that you have received pursuant to your trial subpoenas.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

by:

Cynthia K. Dunne
Seetha Ramachandran
Assistant United States Attorneys
(914) 993-1913/ (212) 637-2546

Enclosures

4

cc: Honorable Kenneth M. Karas (by hand)
    United States District Judge
    (w/Request to Charge and Proposed Voir Dire)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

May 27, 2008

<u>**BY FAX**</u>

Jared Scharf, Esq.
1025 Westchester Avenue, Suite 305
White Plains, New York 10604

**Re: US v Elia and Elyaho**
07 Cr. 543 (KMK)

Dear Mr. Scharf:

In accordance with our continuing discovery obligations please be advised that in addition to the theories that we have previously notified you about, in connection with the subscription charges, we will contend at trial that defendant Elia's corporate tax returns were false for the additional reason that they failed to properly account for cash payroll figures.

In addition, in accordance with our continuing obligations to provide you with potential 404(b) notices, we will contend at trial that Elia's payment of cash salaries off the books led to the filing of false payroll tax returns as well. We will contend that the filing of the false payroll tax returns is evidence of the defendant's intent for the crimes charged.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

By: _____
CYNTHIA K. DUNNE
SEETHA RAMACHANDRAN
Assistant United States Attorneys
(914) 993-1913

cc: Joseph A. Vita, Esq. (by fax)

# EXHIBIT
# D

**DRAFT**

## Yehezkel Elia's Reported Income minus
## Itemized Deductions and a Sample of Other Expenditures

| | Yr 1999 | Yr 2000 | Yr 2001 | Yr 2002 MFS |
|---|---|---|---|---|
| Income Reported | | | | |
| Wages | 102,000 | 102,000 | 114,063 | 50,000 |
| Interest | 563 | 7,570 | 6,268 | 178 |
| Dividends | | 1,074 | 1,699 | |
| Refunds | 1,272 | 771 | 2,324 | |
| Business Income | 3,690 | | | |
| Capital Gain | 300 | 4,549 | 67 | |
| IRA Distributions | 32,634 | | | |
| Rentals | (19,037) | (16,393) | 24,803 | |
| Total Income on Return | $140,459 | $115,964 | $149,224 | $50,178 |
| | | | | |
| Schedule "A" | | | | |
| Taxes | 19,722 | 20,029 | 21,285 | 20,915 |
| Mortgage | 36,342 | 35,381 | 34,813 | 10,942 |
| Contributions | 1,876 | 1,425 | 4,725 | 2,730 |
| Miscellaneous Expenses | 1,667 | | | |
| Total 2106 | | | 8,134 | |
| Total Deductable Amount on "A" | $59,607 | $56,835 | $68,957 | $34,587 |
| | | | | |
| Boston University | 31,915.00 | 24,800.00 | 26,200.00 | 700 |
| Hartford University | | 10,145.00 | 10,000.00 | |
| Columbia University | | | | 6,450.00 |
| Solomon Schechter | 3,000.00 | 13,100.00 | 13,470.00 | 15,730.00 |
| Camp Modin | | 3,500.00 | 1,000.00 | 7,900.00 |
| Travelors Insurance | | | | 3,139.77 |
| Metlife Insurance | | 12,799.00 | 9,600.00 | 4,950.00 |
| Bank Deposits | | | | |
| Investments Rasabi | 62,800.00 | 120,000.00 | | 100,000.00 |
| Other Expenditures | $97,715.00 | $184,344.00 | $60,270.00 | $138,869.77 |
| | | | | |
| Available for Everything Else | (16,863.00) | (125,215.00) | 19,997.00 | (123,278.77) |

GOVERNMENT
EXHIBIT
143
07 Cr. 543 (___)   (ID)