UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------x

UNITED STATES OF AMERICA

v. 07 Cr. 543 (KMK)

YEHEZKEL ELIA and
DAVID ELYAHO,

Defendants.
---------------------------------------------------x

# MEMORANDUM OF LAW IN BEHALF OF DEFENDANT YEHEZKEL ELIA IN SUPPORT OF MOTION IN LIMINE

**JARED J. SCHARF**
ATTORNEY AT LAW
1025 WESTCHESTER AVENUE | SUITE 305
WHITE PLAINS, NEW YORK 10604
(914) 682-9777

# TABLE OF CONTENTS

Page

I. Introduction .......... 1

II. The Indictment .......... 2

III. Defendant's Theory of the Case .......... 3

IV. The Standard for a Motion in Limine .......... 4

V. The Evidence the Defense Moves to Exclude .......... 4

A. Evidence Regarding Paul Lenok .......... 4

B. Certain Testimony by Harjrij Zherka ("Lily") and Certain Potential Government Arguments .......... 8

C. Evidence of Bank Accounts in Israel, Seizures of Cash From Elia at the Border and Expenditures for Elia's Personal Purposes .......... 10

1. The Israeli Bank Accounts .......... 11

2. The Customs Incident .......... 12

3. Elia's Personal Expenditures .......... 13

CONCLUSION .......... 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------x

UNITED STATES OF AMERICA

v. 07 Cr. 543 (KMK)

YEHEZKEL ELIA and
DAVID ELYAHO,

Defendants.
---------------------------------------------------x

**MEMORANDUM OF LAW IN BEHALF OF DEFENDANT YEHEZKEL ELIA IN SUPPORT OF MOTION IN LIMINE**

**I. Introduction:**

Defendant Yehezkel Elia (hereafter "Hezi" or "Elia") respectfully submits this memorandum of law in support his motion in limine

At a conference on March 28, 2008, the Court ordered (among other things) that motions in limine must be made by May 23, 2008, and that objections to evidence to be offered at trial must be made prior to trial.

Defendant Yehezkel Elia respectfully moves to exclude evidence relating to:

(a) an incident at the border on July 25, 2001 at which $42,000 in undeclared United States Currency was seized from Elia;

(b) bank accounts located in Israel in which Elia had a joint interest;

(c) expenditures for Elia's personal purposes;

(d) the manner in which Paul Lenok prepared Elia's and his corporations' tax returns; and

(e) certain testimony by Harjrij Zherka.

In regard to trial objections, defendant has potential objections, but is not able

at this time to articulate all of them absent the *Giglio* material and, in particular, the Section 3500 material. The Court ordered on March 28 (verbally) and on March 31 (in a written order) that *Giglio* and Section 3500 material be produced on or before May 23.

More fundamentally, defendant is unable to determine in advance of the testimony what objections he anticipates making (other than the ones described herein) as much of the determination relies on surrounding circumstances as they unfold at the trial.

## II. The Indictment

Count One of the Indictment charges defendant and his brother David Elyaho with conspiring to defraud the United States in the determination of the taxes of Elia's corporation, Final Touch, by diverting cash from the small store operated by Final Touch, (a 100-square foot kiosk in the Cross Country Shopping Center that sold cheap jewelry), in violation of Title 18 United States Code, Section 371. Counts Two through Five charge Elia with willfully evading his individual income taxes for 1999 through 2002, in violation of Title 26, United States Code (the Internal Revenue Code or "I.R.C."), Section 7201. Counts Six through Thirteen charge Elia with willfully evading the corporate income taxes of three of his stores at the shopping center, Sneaker Mania for (fiscal years ending October 31) 2000, 2001, and 2002; Final Touch for (fiscal years ending March 31) 2000, 2001 and 2002, and Pizza Mania for 2001 and 2002, in violation of I.R.C. Section 7201. Counts Eighteen through Twenty Eight are back-up charges to Counts Two through Thirteen, charging Elia with willfully subscribing to materially false and fraudulent tax returns that are charged as Section 7201 violations in Counts Two through Thirteen, in violation of I.R.C. Section 7206(1). The elements of Sections 7201

and 7206(1) are similar; the most important difference being that Section 7201 requires proof of a substantial additional tax due and owing, whereas Section 7206(1) does not. The latter statute requires proof of a material false statement, which, in Counts Eighteen through Twenty Four is Elia's alleged omission of corporate cash receipts. [1/]

**III. Defendant's Theory of the Case**

Elia will contend (among other things) that the government will not be able to prove substantial additional taxes due and owing for purposes of Section 7201. The government will prove that Elia used cash from his stores to purchase money orders and that he used the money orders to purchase inventory for his stores. To the extent Elia purchased inventory for his stores which inventory he bought with cash from his stores, there is no bottom-line tax effect. The increase in sales is offset by the corresponding increase in cost of goods sold. The government will rely on accomplice testimony to prove that Elia used "a portion of the cash for the payment of [his] personal expenses." Indictment, Count Two, paragraph 9(D). Elia will contend that the accomplice and the government are omitting substantial evidence of purchases that will either negate or at least decrease additional income substantially, that Elia reported sufficient wage income each year and had access to other funds to justify his relatively minor personal expenditures[2/] and that the government will not be able to prove that Elia used unreported income from the years in issue to pay these personal expenses.

---

1/ Count Ten, charging Elia with a violation of Section 7201 for the Final Touch fiscal year ending March 31, 2001 is not backed up by a Section 7206(1) count. All the other Section 7201 counts are.

2/ The government has evidence that Elia used money orders to pay for part of his children's private school, college and camp tuitions, and that he paid for life insurance and real estate taxes, all totaling approximately $200,000 (the defense believes) over a period of four years.

## IV. The Standard for a Motion in Limine

Evidence must be related to some disputed issue in the trial. The first question the court must address in considering a motion in limine is whether the evidence meets the Rule 401 relevance requirement. *United States* v. *Amato*, 2006 WL 1495497 (E.D.N.Y. 2006), citing *United States* v. *Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980); *United States* v. *Quattrone*, 441 F.3d 153, 185 (2d Cir. 2006). If the evidence is relevant under Federal Rule of Evidence 401, and therefore, potentially admissible under Rule 402, it still must survive Rule 403 analysis. In the present case, the items that defendant seeks to preclude are not admissible under Rules 402 or 403.

## V. The Evidence the Defense Moves to Exclude

### A. Evidence Regarding Paul Lenok

An element that the government is required to prove in virtually all criminal tax prosecutions, including those brought pursuant to Sections 7201 and 7206(1), is willfulness, i.e., a violation of a known legal duty. *United States* v. *Pomponio*, 429 U.S. 10 (1976). In order to establish willfulness, the government is required to prove that errors on the tax returns were committed knowingly and intentionally by the defendant and are not the result of negligence, inadvertence, or innocent mistakes, *United States* v. *Quinto*, 582 F.2d 224, 229 at note 1 (2nd Cir. 1978) (reversing conviction on other grounds and approving instruction that "negligence, inadvertence, accident or reckless disregard for the requirements of the law" do not constitute willfulness); *United States* v. *Kleinberg*, 199 F.3d 1324, 1999 WL 980968 (2d Cir. 1999) (unpublished), or undue reliance on the advice of an accountant or other professional. *United States* v. *Evangelista*, 122 F. 3d 112, 117-118 (2d Cir. 1997).

In order to meet this test for proving willfulness, the government invariably calls as a witness the defendant's accountant. *See, United States* v. *Bok,* 156 F.3d 157, 160 (2nd Cir. 1998); *United States* v. *Nathan*, 536 F.2d 988, 990-991 (2nd Cir. 1976). Therefore, a staple of criminal tax prosecutions is the government's use of the defendant-taxpayer's tax return preparer as a witness to testify that he prepared the tax returns honestly and competently based on evidence provided to him by the defendant-taxpayer. Absent such testimony, there is a hole in the government's proof of a chain of communication from the taxpayer-defendant to the tax return preparer and ultimately to the tax return, and a jury could conclude that the government failed to connect the taxpayer to responsibility for any false information that may appear on the tax return.

In this case, the accountant who prepared all the tax returns in issue was Paul Lenok. Lenok will not testify at the trial; he is dead. Apparently, the government has some sort of a back-up plan to support its anticipated and seemingly essential argument that Elia was responsible for communicating false sales and purchases information to Lenok. Of course, to the extent the government's back-up plan involves hearsay testimony of what Lenok said to investigating agents, Elia will object pursuant to Federal Rule of Evidence 802 and any portion of Rules 801-804 that the government may cite as an exception to or as a definitional exclusion from the hearsay rules. Furthermore, Elia will object to any third-party testimony regarding Lenok's character. See Federal Rule of Evidence 608(a) and (b) (pertaining to witnesses.). Lenok is not a witness and, therefore, may not be bolstered as provided by Rule 608, even if the rule applied otherwise, which it does not.

Additionally (and of far greater concern), to the extent the government's back-up

plan includes collateral or laudatory testimony as to Lenok or extrinsic evidence that Lenok prepared the returns in issue in a competent, professional and/or honest manner, or that he relied solely or principally or materially on information provided by Elia, the defense will object to such testimony as well. Moreover, and in particular, the defense will seek to preclude unsupported arguments concerning Lenok.

The basis for this objection (aside from hearsay, improper bolstering, the collateral evidence rule, and the rule against making unsupported arguments in summation) and for the defense's apprehensions is (a) the crucial nature of such evidence to the government's ability to prove willfulness on the part of Elia, (b) the government's reliance on unsupported arguments in its rebuttal summation in a recent trial, and (b) the government's refusal to provide the defense any negative information it may possess regarding Lenok.

The defense requested results of examinations of tax returns prepared by Lenok, results of criminal investigations of taxpayers whose tax returns were prepared by Lenok, Special Agent's Reports and supporting evidence pertaining to Lenok, and notes of interviews, memoranda, etc. from and in behalf of Lenok concerning any taxpayer, including, but not limited to, Elia. See Exhibits A and B.

The government refused to provide the requested information. The grounds for its refusal were as follows:

(a) Ms. Dunne "has been advised that the I.R.S. only maintains computerized preparer information for three years and that it does not cross-reference its audits ….",

(b) Retrieval is further complicated by the fact that Lenok did not use his tax return preparer identification number and therefore retrieval could take weeks or

longer,[3/] and

(c) Since Lenok will not testify, any such information is not relevant. [4/]

See Exhibit C.

The I.R.S. maintains a preparer database containing such information. One purpose of this database is to track the conduct of preparers in order to determine whether a pattern of misconduct warrants disciplinary, civil injunctive, or criminal actions or civil fines, pursuant to I.R.C. Sections 6694, 6695, 6701, and 7206(2), and other statutes used in preparer prosecutions, and pursuant to I.R.S. Circular 230 (regulating the conduct of persons who appear before the I.R.S. and providing for disciplinary actions).

Since it is the government's position that any such negative evidence concerning Lenok would not be relevant (Exhibit C), the government should not be permitted to offer favorable evidence that tends to support the propriety of Lenok's tax return preparation

[3/] The defense request was not limited to information in the I.R.S.'s preparer database. The defense believes that the I.R.S. agents assisting in the present case possess extensive information regarding Lenok independent of the database. In addition, the three-year rule is quite unlikely, as well as unresponsive as to information within the three years. Further, the I.R.S. website and the I.R.S. Form W7-P (Application for Preparer Tax Identification Number ("PTIN")) (Exhibit D) indicate that a PTIN is available as an alternative for preparers who prefer not to use their Social Security Number – clearly suggesting that tax return preparer information is accessible by SSN as well as by PTIN. Lenok did use his SSN on the tax returns in issue. This excuse for non-production is plainly vacuous.

[4/] That assertion is inconsistent with the government's rebuttal summation in *United States* v. *Josephberg*, S.D.N.Y. S04 Cr. 1002 (CLB). In that case, an assistant United States attorney argued (without supporting evidence in the record) that the defense "had a chance to go out and look to see if he (the preparer) did anything wrong with anyone else's return. You didn't see anything else." See Exhibit E Here, the defense seeks to preclude unsupported arguments like the one in *Josephberg*. In addition, such adverse information regarding a tax return preparer is discoverable *Brady* material in any event.

processes in general or as they pertain to Elia and his corporations in particular.

The defense cannot conceive of every possible means by which the government may attempt to bolster Lenok's preparation and attribute errors to Elia's failure to provide him with all pertinent information. However, given (a) Lenok's unavailability, (b) the government's duty to prove willfulness, and, therefore, negate error attributable primarily to the preparer (as opposed to Elia), (c) the government's refusal to provide the defense evidence that may reflect adversely on Lenok, (d) the government's assertion that such evidence is not relevant, and (e) the U.S. Attorney's Office's approval of an unsupported argument by another AUSA in a rebuttal summation that the defense had a "chance to go out and look to see if [the preparer] did anything wrong on anyone else's returns (Exhibit E)," the government ought to be precluded from offering any positive evidence and from making any positive arguments supporting Lenok. This preclusion is based on the hearsay and collateral evidence rules, and, more particularly, the government's admission to the defense that negative evidence regarding Lenok is not relevant. Therefore, positive information is similarly not relevant.

### B. Certain Testimony by Harjrij Zherka ("Lily") and Certain Potential Government Arguments

The government's cooperating witness is Harjrij Zherka ("Lily"). Lily was Elia's corporation's bookkeeper during the years in issue. Since the defense concedes that Elia used cash from the stores to purchase money orders, and since the government concedes that the money orders were used to purchase inventory for the stores, the crucial issue is whether Elia purchased additional money orders (a) with cash from the stores (b) that he used to pay for personal expenses. The government's ability to prove a tax deficiency

depends on whether it can prove that Elia purchased such additional money orders that he did not use for inventory or other business expenses. Lily seems to be the sole or primary witness to prove this.

The defense expects to cross-examine Lily in the manner in which cooperating witnesses traditionally are cross-examined, i.e., by proving that she is lying to achieve some benefit for herself. One feature of the cross-examination will be questions relating to the defense's good faith belief that Lily embezzled money from Elia's corporation by writing checks to accomplices who rebated some or all of the proceeds to her. The defense's basis for this belief is our discovery of checks to payees who are unfamiliar to Elia. These checks appear to be in Lily's handwriting and are not signed by Elia. To establish a connection between Lily and the payees, the defense requested that the government provide the defense with Lily's telephone numbers for the years in issue. See Exhibit B. The government refused to provide such information on grounds that it is "personal information" and constitutes a "fishing expedition into the details of her personal life." See Exhibit C.

We believe that an inquiry into Lily's connection to unknown payees is a justified inquiry into her "personal life." It is the price cooperating witnesses pay for the deals they make. Since the government refuses to make available to the defense information necessary to its investigation of the government's cooperating witness, the government should be precluded from denying that Lily embezzled funds from Elia's corporation. Further, since Lily is the government's cooperating witness, she should be precluded from denying in her testimony that she had personal telephone conversations with the payee or payees in question.

### C. Evidence of Bank Accounts in Israel, Seizures of Cash From Elia at the Border and Expenditures for Elia's Personal Purposes

The government appears to be intending to offer evidence that (a) Elia had signature authority over bank accounts in Israel, his birth country and where he has relatives, including brothers and an ailing mother; (b) Elia was stopped at the border for carrying $42,000 of undeclared currency on July 25, 2001; and (c) that he paid for personal expenditures using money orders.

Normally, such evidence is admissible in a criminal tax trial under Rule 402 or 404(b), Federal Rules of Evidence. However, in this case, such evidence runs afoul of Rule 403, if not Rule 402. Under Rule 402, evidence is admissible if it is relevant, and, under Rule 401, it is relevant if it has any tendency to make the existence of any consequential fact more probable or less probable than it would be without the evidence. Neither the Israeli bank accounts, the currency seizure, nor the personal expenditures meets this test. The reason boils down to a question of degree. The Indictment alleges that Elia evaded over $1.6 million in corporate and individual taxes. Given that this is a double tax (the same income is taxed both at the corporate level and at the individual level), the alleged diverted cash to generate such a large tax had to have been in the area of $2.5 million more or less.[5/]

Whatever the exact amount of alleged omitted income may be, in order to generate a tax of over $1.6 million as alleged in the Indictment, the defense believes that such amount of alleged omitted income must be based on a substantial discounting of

[5/] This figure is an estimate of the omitted income to be alleged by the government as the government has not provided its expert computations to the defense.

Elia's actual business purchases. The defense believes that the government has failed to account for all the purchases and that the government foolishly is relying on Lily's honesty. However, the evidence will establish that Lily overstated sales and understated purchases in alleged business records that she fabricated and turned over to the government, and that she removed evidence of purchases, i.e., purchase invoices, from the premises in advance of the execution of the search warrant. She was aware of the imminent search as she was the Confidential Informant in the search warrant affidavit.

Since the government seeks to argue to the jury that Elia concealed millions of dollars of income, its evidence of foreign bank accounts, use of money orders to pay for personal expenses, seizures of currency from Elia has no probative value unless the amounts involved bear some relationship to the amount of cash that was allegedly diverted. If they do not, the evidence lacks any probative value under Rule 401. Relatively minor dollar amounts are capable of being explained by innocent behavior, as opposed to giving rise to an inference that Elia diverted millions of dollars of cash from his stores.

**1. The Israeli Bank Accounts**

The Israeli bank account balances are not only in relatively unremarkable amounts, but, more important, these bank accounts are jointly owned by Elia and members of his family living in Israel, and the government has disclosed no evidence that these accounts were funded by cash diverted from Elia's stores. Given the likelihood that the Israeli bank balances were funded wholly or principally by Israeli relatives with income or savings derived in Israel, and our belief that the government lacks evidence to link the balances to cash diverted from the stores, the bank account evidence does not

have any tendency to make the existence of tax evasion in New York more probable than it would be without the evidence, and it ought to be excluded.

**2. The Customs Incident**

Similarly, the seizure of currency at the border in the amount of $42,000 was but a small fraction of the millions of dollars of allegedly evaded income ($42,000 is .0168 of $2,500,000). Moreover, the U.S. Customs Service reported the seizure to the I.R.S., and after inquiry, refunded the sum to Elia (less a penalty of $5,000 for failure to declare it). No charges were brought. Elia's basis for requesting the return of the funds was that they were rents he collected from a residential building he owned that generated $3,500 in rental income per month, which he reported on his tax returns, and that he was bringing it to Israel to repay a loan he received from his mother. See Exhibit F. Elia also cited his concern that he might miss his flight if he declared the income at the time he was asked to sign the declaration, and the fact that he did not conceal the cash as he carried it in his carry-on luggage, which he knew would be searched.

Given the government's (including the I.R.S.'s) forebearance from asserting forfeiture and from asserting additional taxes based on this currency, the government's apparent acceptance of Elia's justification, the relatively small sum, and the isolated nature of the incident, the evidence has no tendency to make the existence of elements of the offense (willful intent, substantial additional tax due and owing) more likely than it would be without the evidence, and it ought to be excluded. Further, the government possesses no evidence that tends to link the seized currency to the stores.[6/]

[6/] This point was made clear in the government's Opposition to Elia's motion to suppress.

**3. Elia's Personal Expenditures**

Finally, the government appears to intend to offer evidence that Elia used money orders to pay personal expenses. From our review of the government's discovery, it appears that these expenditures were for his children's school, college and camp tuitions, for personal real estate taxes, and for life insurance. It further appears that the sum total of these personal expenditures is approximately $200,000 for the four years in issue. However, the wage income that Elia reported on his tax returns was sufficient to cover (or nearly cover) these personal expenditures. In addition, even if the wages Elia reported on his tax returns were not sufficient to support these expenses, the amount by which the sum of $200,000 of personal expenditures exceeds reported income over a four-year period in a case involving an alleged $2,500,000 of diverted cash lacks any probative value. It is not unreasonable to expect that a businessman in his fifties might well have access to cash from sources other than unreported cash diverted from his stores during the Indictment period. Thus, the evidence lacks probative value.

The amounts and the circumstances are not sufficient to be relevant to intent under Rules 401, 402 or 404(b). They do not have any tendency to make the existence of cash diverted from the stores to the extent of $2,500,000 more likely than it would be without the evidence. The evidence does not have any tendency to make the existence of willful intent more likely than it would be without the evidence.

Moreover, even if the evidence of Israeli bank accounts, undeclared removal of $42,000 currency from the country, or $200,000 in personal expenditures did have a tendency to make the existence of intent more likely, the probative value pales when balanced against the potential for unfair prejudice and confusion, and, therefore, ought to

be excluded under the balancing test of Rule 403. In the circumstances of this case, the danger of unfair prejudice arising from the inferences of sinister conduct by Elia (i.e., a Customs search arising from a false declaration and a foreign bank account) and of a privileged lifestyle (private high school, camp, and a prestigious private university for Elia's children, etc.) that the government predictably will ask the jury to draw substantially outweigh the probative value.

Finally, the government provided the defense an extensive file showing Elia's purchase of a luxury car. Since the car was paid with checks from the business, and none of the payments for the car was by money order or cash, evidence pertaining to the car lacks any possible claim of relevance. The Indictment does not charge Elia with improperly writing checks from his business to pay for the car. References to the luxury car ought to be precluded.

## CONCLUSION

Based upon the foregoing, certain evidence and arguments ought to be excluded as not relevant. Regarding Paul Lenok, the government has admitted that negative evidence is not relevant. For the same reason, favorable evidence is not relevant. Regarding Lenok and Harjrij Zherka, the government's refusal to provide evidence that tends to prove the opposite of what the defense seeks to exclude justifies exclusion. As to the Israeli bank accounts and the personal expenditures, the amounts are insufficient to be probative in a case of this magnitude, and there is no evidence to connect the amounts to cash alleged to have been diverted from Elia's stores.

As to the Customs seizure from Elia of undeclared currency, the relatively minor

amount, the isolated nature of the incident, and the I.R.S.'s apparent approval of Elia's explanation for the cash and its apparent acquiescence in returning the seized money makes the seizure irrelevant. All three of the latter events do not have any tendency to make the existence of a consequential fact more likely than it would be without the evidence. Moreover, the probative value is substantially outweighed by the danger of unfair prejudice and confusion.

Respectfully submitted,

Jared J. Scharf
1025 Westchester Avenue
White Plains, New York 10604
(914) 682-9777

Attorney for Defendant
Yehezkel Elia

Adam L. Scharf
1025 Westchester Avenue
White Plains, New York 10604
(914) 682-9777

Of counsel

Dated: White Plains, New York
May 23, 2008