

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 6, 2008

**BY HAND**

Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
United States Courthouse
New York, NY 10007

**MEMO ENDORSED**

<u>Re:</u>  <u>United States v. Elia and Elyaho,</u>
         07 Cr. 543 (KMK)

Dear Judge Karas:

The Government writes to address the issues raised at the June 4, 2008 pretrial conference in this case.

**A. Discovery**

Following the May 2, 2008 production of Government Exhibits, as records have arrived and as new legal arguments have been raised by counsel, the Government has marked some additional trial exhibits. Those documents consist primarily of documents received recently from third-parties, as well as some documents that were previously produced in discovery, but were not identified as trial exhibits for a number of reasons.

By letter dated May 27, the Government provided counsel with copies of Government Exhibits 25015 through 25121, the sales tax returns for Elia's corporations. Mr. Scharf's repeated assertion that he did not receive these documents in discovery is demonstrably false. Those records were retrieved from the files of Mr. Elia's deceased accountant, Paul Lenok. According to the records of IRS Special Agent Nicholas Nelson, the Lenok records were maintained in two boxes that Mr. Elia and his two accountants

1

reviewed on August 21, 2007. After their review of the records, a large portion of those records were sent out to the copier.

The remainder of the records produced over the past two weeks fall into a few broad categories: 1) those that were just produced to the government and which we could not have produced earlier (some of these records were produced with GX numbers and others that the Government does not intend to offer were produced with bates numbers); 2) miscellaneous records that were produced in discovery and that have become relevant in the course of preparing witnesses for their trial testimony (the data from many of these records appear in the government's financial analyses; 3) Certified Supplemental or IRS transcripts of accounts – records that detail return filing dates and similar information pertaining to the filings of the defendants' tax returns. In addition, a few of the "new" exhibits are records that have already been marked as trial exhibits, however, they bear a "new" exhibit number because they were gathered from an alternative source or merely for ease of reference during trial (for example, a few pages of an exhibit already marked that consists of a large folder of documents).

If it becomes necessary in the future to mark additional trial exhibits, then we will identify the reason for late production of those additional exhibits as we produce them to counsel, so that they can make any application that they deem appropriate. We are required to produce the newly received third-party records under Rule 16.

**B. The Customs Seizure**
The Government anticipates offering the testimony of a Customs Official who asked Elia if he was taking more than $10,000 in cash out of the country. Elia falsely stated that he had under $10,000 and a subsequent inspection discovered that Elia was carrying approximately $43,000 in cash. The majority of the cash was seized as probable contraband. Thereafter, Elia was given an opportunity to petition for the return of the money and all but $5,000 was returned to him by check. This testimony would be offered through a representative of US Customs who would testify that: she had a conversation with Elia; Elia was provided with an opportunity to file a petition for the return of the cash; and that as a result of that petition, all but $5,000 was returned to Elia.

The Government would not offer the written hearsay petition filed by Elia about the source of the money and objects to its admission. The Government will offer testimony about the return of the money to Elia, to explain Elia's subsequent deposit of his own funds into a bank account that he maintained in the name of his Israeli brother Samyr. In fact, Elia spoke to a witness about this incident and stated, in substance and among other things, that he had been caught with cash that he had forgotten to conceal on his body and that he had mistakenly left the cash in his carry-on bag. Accordingly, the admission of the

petition could put Elia in an even worse position, as the jury easily could conclude that he lied twice to Customs officials (he offered a different explanation to Customs in connection with the petition).

Mr. Scharf stated that the money was only returned to Elia after a review of the matter by the IRS. We have consulted with counsel for Customs and they are investigating whether this is in fact true. We have been advised, however, that an IRS review is not ordinarily part of their process.

### C. Lenok's Statements in Furtherance of the Conspiracy Are Admissible

The Government anticipates that Ms. Zherka will testify about the following, in substance:

- She worked in the Elia office and Paul Lenok maintained a desk and an office in the suite.
- Lenok came to work at the Elia office 1 to 2 days per month. He prepared the corporate tax returns, the sales tax returns and the payroll tax returns. Lenok also prepared financial statements for the companies.
- Lenok's desk was covered with Elia's vendor invoices and money orders. On occasion, Zherka and Lenok discussed that the existence of these records could be Elia's downfall, if the IRS ever got a hold of Elia's records. Lenok told Zherka that he had discussed this issue with Elia, and that Elia was not going to change the way that he did business.
- Elia told Zherka that the existence of her records of sales and expenses would help him if there was an audit or search because it would make it look like his actions were not intentional – it would look like it was an oversight or mistake. Zherka discussed this statement with Lenok and Lenok laughed.
- At one point while she was working for Elia, the New York State sales taxes were lowered and Zherka suggested to both Elia and to Lenok that Elia start depositing some of the money into the corporate bank accounts, because it would not cost him as much. When she first spoke with Lenok, Lenok said that he would discuss it with Elia. Lenok later reported back to Zherka that Elia had told him that he did not want to put the money into his corporate bank accounts because it would be a "red flag" that would call attention to the money that his businesses were generating.
- Zherka was not involved in the preparation of the corporate tax returns. At the end of the fiscal year for the particular company Lenok and Elia would go into Elia's office to privately discuss the tax return preparation and the final tax return. On one occasion, Elia was not in the office when Lenok came to the offices with a tax return for SneakerMania. Lenok asked Zherka to give the return to Elia when he returned to the office. Zherka looked at the tax return and saw that it reported no

taxable income and she questioned how they could report no income from such a profitable business. Lenok replied, in substance, that she should not worry about it or ask questions, she should just give the tax return to Elia. She later raised the issue with Lenok again, and Lenok said that he had warned Elia that he could get into trouble, but that Elia was not going to change anything.

- The Elia corporations utilized a payroll service for most of its employees, who were paid on a flat hourly basis. One year a worker filed a complaint with the Department of Labor about Elia's failure to pay overtime. When the audit concluded, Elia was required to pay back wages for overtime. Shortly thereafter, Lenok instructed Elia and Zherka to pay the workers their overtime payments in cash, to avoid being taxed on those additional payments.
- Zherka had occasional discussions with Lenok about the financial statements that he created for the companies so that they could get credit from their vendors. Lenok kept a handwritten notebook at his own office from which he created the financial statements and those charts included Elia's records of cash sales. On occasion, at Elia's direction she and Lenok would confer about changing some of the figures and reconciling their respective records.

### 1. The Applicable Law.

In order to admit a statement under Rule 801(d)(2)(E), the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 175 (1987). The party offering the statement must prove these preliminary facts by a preponderance of the evidence. 483 U.S. at 176. The Supreme Court has made clear that the proffered allegedly hearsay statement may itself be considered in making the Rule 801(d)(2)(E) determination. See Bourjaily, 483 U.S. at 181; United States v. Padilla, 203 F.3d 156, 161 (2d Cir. 2000); United States v. Broussard, 80 F.3d 1025 (5th Cir. 1996).

It is not necessary that the declarant be formally charged as a codefendant, nor is it even necessary that a conspiracy be charged in the indictment. See United States v. Cambindo Valencia, 609 F.2d 603 (2d Cir. 1979); United States v. Jones, 542 F.2d 186 (4th Cir. 1976); United States v. Doulin, 538 F.2d 466 (2d Cir. 1976); United States v. Layton, 855 F.2d 1388 (9th Cir. 1988). The fact that one party to the conversation is not a member of the conspiracy, or even a government agent or confidential informant, does not preclude admission of statements by the declarant, as long as the declarant was a member of the conspiracy. See United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994) (communications to someone not a member of the conspiracy can be in furtherance of conspiracy's goals); United States v. Williamson, 53 F.3d 1500 (10th Cir. 1995). The co-conspirator declarant need not be present in court or subject to cross-examination as a

prerequisite for the admission of his or her out-of-court statement. See United States v. Inadi, 475 U.S. 387 (1986); United States v. Caputo, 791 F.2d 37 (3rd Cir. 1986).

Though "merely narrative descriptions by one co-conspirator of the acts of another" are not necessarily made in furtherance of the conspiracy, see United States v. Beech-Nut, 871 F.2d 1171, 1199 (2d Cir. 1989), co-conspirator statements may be found to be "in furtherance" of the conspiracy if they "prompt the listener to respond in a way that facilitates the carrying out of criminal activity." Beech-Nut, 871 F.2d at 1199 (citing United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987)). As the Second Circuit explained in United States v. Maldonado-Rivera:

> In addition to the more obvious types of communications to implement a conspiratorial operation, statements between co-conspirators that may be found to be in furtherance of the conspiracy include statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy.

Maldonado-Rivera, 922 F.2d 934, 959 (2d Cir. 1990) (emphasis added); accord Padilla, 203 F.3d 161; United States v. Diaz, 176 F.3d 52, 85 (2d Cir. 1999) (narrative statement several days after murders, describing who shot whom and with what weapons, was in furtherance of overarching RICO and narcotics conspiracies, since designed to foster cohesiveness).

Thus, statements between co-conspirators that "provide assurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy. United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991); see also United States v. Thai, 29 F.3d 785 (2d Cir. 1994)("statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy, such as to promote[ ] cohesiveness") (internal quotations omitted); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987)(statements "that apprise a coconspirator of the progress of the conspiracy" further the conspiracy); see also United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994) (statements "designed to promote or facilitate achievement of the goals of the conspiracy," further the conspiracy).

Whether a statement is made "in furtherance" of a conspiracy is a preliminary question of fact to be determined by the trial court by a preponderance of the evidence. See Beech-Nut, 871 F.2d at 1198; United States v. DeJesus, 806 F.2d 31, 34 (2d Cir. 1986). A District Court's finding that a given statement is made "in furtherance" of a conspiracy will not be disturbed unless it is clearly erroneous. See Beech-Nut, 871 F.2d

at 1198; DeJesus, 806 F.2d at 34. That the evidentiary standard for proving the "in furtherance" element is a low one and that the standard of appellate review is deferential is in keeping with the more general principle that "[t]he in furtherance requirement of Rule 801(d)(2)(E) is construed broadly." United States v. Escobar, 50 F.3d 1414, 1423 (8th Cir. 1995); United States v. Limones, 8 F.3d 1004, 1008 (5th Cir. 1993). The Supreme Court has made clear that the order of proof and general conduct of the trial are within the District Court's discretion; the Court may admit declarations by alleged conspirators prior to the time that all of the requirements for admissibility have been established by independent evidence. Bourjaily, 483 U.S. at 176 n.1.

Further, the admission of these statements is not barred by Crawford v. Washington, 541 U.S. 36 (2004), which held that the Sixth Amendment's Confrontation Clause prohibits the admission of out-of-court statements that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant concerning the statements. See United States v. Logan, 419 F.3d 172, 178 (2d Cir. 2004) (noting that "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial" and are therefore not barred by Crawford); United States v. Hansen, 434 F.3d 92, 100 (1st Cir. 2006) (rejecting Crawford challenge because "the challenged statements are nontestimonial because they are either co-conspirator statements made during the course of and in furtherance of the conspiracy, or casual remarks which the declarant would not reasonably expect to be available for use at a later trial").

### 2. Discussion

At trial, the Government expects to establish that Elia defrauded the IRS with the assistance of Ms Zherka and Mr. Lenok – they are unindicted co-conspirators in Elia's scheme to evade his personal and corporate taxes. In fact, at various times during her employment, Zherka received a portion of her salary off the books and she knew that Elia was falsely reporting his earnings to taxing authorities and she facilitated his criminal conduct. Likewise, Lenok knew full well that the tax returns he prepared were false. The Government intends to elicit from Zherka the above testimony about her discussions with Lenok, during the course of the conspiracy. These statements come in because they are discussions about a fraud that they were committing together and facilitating and Lenok was at times directly or implicitly instructing Zherka to continue in the same course of conduct and/or advising her of the current status of the criminal agreement. Lenok's statements go to the

Lenok's statements plainly pertain to the conspiracy to evade Elia's massive tax liability and were made in furtherance of that conspiracy— as they serve to" maintain trust and cohesiveness" among the participants and to "inform each other of the current

6

status of the conspiracy.," United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991); see also United States v. Thai, 29 F.3d 785 (2d Cir. 1994) ("statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy, such as to promote[ ] cohesiveness") (internal quotations omitted); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987) (statements "that apprise a coconspirator of the progress of the conspiracy" further the conspiracy).

Further Lenok's statements about his conversations with Elia are admissible on the independent basis that they are not hearsay, but rather a statement of a Elia's agent in a matter within the scope of the agency or employment, made within the scope of that relationship, under FRS 801(d)(2)(D). Lenok was working on the premises as an accountant for Elia and he spoke about Elia's tax matters to Zherka, Elia's book keeper. United States v Rioux, 97 F.3d 648 (2d Cir. 1996).

### D. Giglio Material – Paul Lenok

The IRS has run an informational transcript on Mr Lenok which reflects that there were no tax preparer fines or penalties levied or assessed against Mr. Lenok for either negligence, lack of due diligence or any other practice-based infraction from 1969 to the present. IRS records do show that Lenok sustained a late payment penalty for his late payment of taxes three times, in 1995, 1998 and 1999.

In the course of the Elia and Elyaho investigation, Lenok was approved by the Department of Justice as a criminal subject and the IRS was authorized to conduct a criminal investigation of Lenok. Other than in connection with the instant case, Lenok was never the subject of any other criminal investigation (administrative or grand jury), from 1981 to the present. From 1990 to the present Lenok was not the subject of any civil audit.

### E. 404(b) Evidence Against David Elyaho

The Government's evidence of David Elyaho's involvement in the larger scheme will consist of the following: 1) He occasionally covered for Elia and picked up cash when when Elia was unavailable or out of town, and he took that cash to Elia's corporate

7

headquarters; 2) On rare occasions, when Elia was out of town and a vendor would not wait for a payment, David purchased money orders for the payment of SneakerMania vendors; 3) he was paid a small salary on the books through PizzaMania, even though he did not work there; 4) David had access to the safe in Elia's office, where they kept cash.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

by: *Cynthia Dunne*

Cynthia K. Dunne
Seetha Ramachandran
Assistant United States Attorney
(914) 993-1913

cc: Jared Scharf, Esq. (By Fax)
    Joseph A.. Vita, Esq. (By Fax)

*The Clerk of Court is respectfully requested to docket this letter.*

SO ORDERED

KENNETH M. KARAS U.S.D.J.
6/17/08