**Buchanan Ingersoll & Rooney PC**
Attorneys & Government Relations Professionals

620 Eighth Avenue, 23rd Floor
New York, NY 10018-1669

T 212 440 4400
F 212 440 4401
www.buchananingersoll.com

Stuart I. Slotnick
212 440 4435
stuart.slotnick@bipc.com

# MEMO ENDORSED

August 25, 2008

**VIA FACSIMILE & EMAIL**
The Honorable Kenneth M. Karas
United States District Court
Southern District of New York
United States Courthouse
300 Quarropas Street, Room 533
White Plains, New York 10601

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____
```

Re: **United States v. Yehezkel Elia - Docket No. 07-CR-543 (KMK)**

Dear Judge Karas:

We write in response to the Government's letter opposing Mr. Elia's request for work release under the escort and supervision of two trained, licensed and armed guards during the work hours of 9 a.m. and 7 p.m. Because this proposed temporary bail application virtually eliminates Mr. Elia's ability to flee, Mr. Elia has in effect proven by clear and convincing evidence that he is not a risk of flight. In fact, the Government's dubious implication that Mr. Elia remains a risk of flight, notwithstanding the fact that he will be encircled by two armed guards at all times he is not incarcerated, must be predicated on the unfounded suggestion that Mr. Elia will engage in a conspiracy to overpower two armed guards. The Government's suggestion is unjustifiable, over-the-top, and not based on reality. Accordingly, it should be rejected.[1]

We agree with the Government's statement in its penultimate paragraph that "the defendant himself poses no danger to the community" and is detained because of the Court's concerns that he is a flight risk. The Government's response cites numerous inapposite cases involving dangerous and violent organized crime figures, a slave-holder, and a high-ranking Russian fugitive, all of which do not address the central issue that prevented the Court from releasing Mr. Elia pending his sentencing, namely, whether there were any conditions that would guarantee his attendance at all court hearings and compliance with the conditions of his release. On behalf of Mr. Elia, we respectfully contend that the requested relief of restricted daily leave, under trained, professional, armed guards -- all of whom are former law enforcement officials -- does so.

---

[1] Although Mr. Elia was convicted of various white-collar crimes, there was no evidence adduced at trial (or even known to the Government) to suggest that it would be in the realm of possibilities that Mr. Elia would attempt a forceful escape by subjugating two armed guards. In fact, as discussed herein, the Government concedes that Mr. Elia is not a danger to the community.

The Honorable Kenneth M. Karas
August 25, 2008
Page 2 of 4

Mr. Elia Does Not Seek To Construct A Private Jail As Suggested By The Government

We first address the Government's contention that this bail application impermissibly relies on Mr. Elia's wealth to allow him to remain under house arrest when Mr. Elia only seeks daily leave from the County jail. In fact, Mr. Elia is in the process of compiling records to supplement his bail application that may allow him to remain fully at liberty while he tends to his businesses and assists his attorneys in advance of sentencing.[2]

In support of the oft-stated principle that an inmate should not be permitted to construct his own high-security prison to avoid detention, the Government cited United States v. Agnello, 101 F. Supp. 2d 108 (E.D.N.Y. 2000), a case involving the prosecution of Carmine Agnello, a made member of the Gambino Organized Crime Family of La Cosa Nostra and the son-in-law of John Gotti. Agnello, who was held to be a danger to the community, made a request for home detention at his Long Island mansion that he shared with his wife Victoria and their children. Agnello's request involved sophisticated monitoring and 24-hour surveillance in a portion of the mansion which was at best untenable in such a large home. In reversing Magistrate Judge Levy's granting of bail to Agnello, Judge Gershon focused exclusively on the defendant's danger to the community. She highlighted that the indictment alleged criminal activities utilizing "threatened and actual use of force, violence, and fear" and pointed to "incidents of actual or threatened obstruction of justice." Agnello at 110-111. Judge Gershon found the evidence revealed "that the defendant is contemptuous of the court process, readily resorts to violence and intimidation to serve his own ends, and presents a clear danger to witnesses and to the integrity of these judicial proceedings." Agnello at 114. The quote of Judge Gershon selected by the Government that Agnello should not be permitted to purchase his way out of detention was understandable given the grandiose surroundings he sought to use as his confinement and the danger he presented. Because Mr. Elia does not present a danger to the community and will be within physical reach of two armed guards at all times that he is on daily leave, nothing similar is presented by Mr. Elia's request. The Government's attempt to analogize Agnello to the instant case is misplaced and inappropriate.

The Government's citation to United States v. Orena, 986 F.2d 628 (2d Cir. 1993), is similarly inapposite. Orena was a member of the Colombo Organized Crime Family of La Cosa Nostra who was involved in several killings during the internecine family struggle that left many members dead. In reversing the grant of bail, Judge Winter described Arena as "a crime figure who directed a crew to perform crimes." Orena at 632. No such danger is presented here.

Furthermore, in United States v. Borodin, 136 F. Supp. 2d 125 (E.D.N.Y. 2001), the defendant, a State Secretary of the Union of Russia and Belarus and former Chief of the Administrative Directorate of the Russian Federation, was denied bail pending an extradition hearing because the court was concerned, among other reasons, that Borodin has no significant ties to the

---

[2] Because this Court heard extensive argument and received written submissions related to Mr. Elia's need to be at liberty to transition and run his businesses -- and to ensure the future of approximately 50 employees' jobs -- we will not burden the Court with a reiteration of those facts.

United States which would prevent his flight and because the "Magistrate Judge was primarily concerned that, even under 24-hour surveillance, Borodin could seek haven within the consulate or on another Russian diplomatic property." Borodin at 132. Because Mr. Elia, is not a diplomat or political figure, has lived exclusively in the United States for over 30 years, does not face extradition to another country, has three American children -- all of whom live in New York -- and does not seek house arrest, the reference to Borodin is misplaced.

Because Mr. Elia does not pose a danger to the community and only seeks daily leave from incarceration, the situation presented herein is distinguishable and materially different from all of the Government's cited cases. If this application is granted, Mr. Elia will spend the majority of each day in his jail cell -- not in a luxurious home. Furthermore, distinguishable from house arrest, Mr. Elia will be within arms-reach of two armed guards at all times. The request he makes hardly involves the purchase of a better form of confinement.

United Security Incorporated. ("USI")

The Government further suggests that Mr. Elia's ability to speak Hebrew poses a security concern for USI. To eliminate this issue from the Government's list of concerns, Mr. Elia will only speak English if permitted daily release pursuant to this application.[3]

I have been further informed that when the Government questioned the President and Founder of USI, Mr. Carmine Aquila, he was asked very restricted questions whose answers fail to reveal that USI is in fact willing and capable of performing the task at hand. In response to the question, "Has USI ever escorted a defendant for two-weeks, without knowing where USI was going and then returned the defendant to jail at the end of the day," the answer was in the negative. However, USI has indicated that they have escorted criminal defendants to multiple locations in a single day (including weddings, banquet halls, funerals and churches) and are capable of supervising and ensuring the Mr. Elia remains at their side during the period of time that he is not incarcerated.

Furthermore, despite the fact that the Government failed to request that the defense add certain restrictions and limitations to its application, in response to the Government's concern that Mr. Elia will be able to travel between various undisclosed locations, Mr. Elia will submit an itinerary of his proposed travel to both the Government and USI at least 24 hours in advance of such travel.

Finally, because USI has the sole discretion to handcuff or search Mr. Elia during transportation between stores and offices and because they may handcuff or search him at any time, we respectfully submit that the Government's proposed concerns, on behalf of USI, have been sufficiently addressed.

---

[3] As stated in our August 15, 2008 letter to your Honor, Mr. Elia must and will comply with all directives of the two USI armed guards. Accordingly, in the absence of the Government raising this specific issue, USI would have been able to order Mr. Elia to only speak in English, if that was a concern for USI.

The Honorable Kenneth M. Karas
August 25, 2008
Page 4 of 4

### The Proposed Suretors

With regard to proposed suretors, we have gathered information concerning the proposed suretors who are Mr. Elia's three children and ex-wife. As we have informed the Government, we are in the process of compiling financial information with regards to the four individuals and anticipate that such information will be submitted on or before Tuesday August 26, 2008.

As we mentioned on August 4, 2008, all four of the proposed suretors are United States citizens who will all face certain financial ruin and be rendered homeless should Mr. Elia flee. They are all so confident in his willingness to stay and face the consequences of the Court's judgments that they have agreed to act as suretors no matter how large the bond requested. If the Government believes that in the face of a personal judgment against them, they would flee the country, they are all prepared to surrender their United States passports which are the only passports they have.[4]

### Conclusion

In light of the foregoing, and the record before this Court, we respectfully request that your Honor grant Mr. Elia's application with whatever limitations and restrictions this Court finds to be appropriate.

*The Clerk is respectfully requested to docket this letter. So Ordered.*

*[signature] 8/28/08*

Respectfully,

[signature]

Stuart P. Slotnick

cc: Cynthia Dunne, Esq. (via email, facsimile 914 993-1980 & First Class Mail)
Seetha Ramachandran, Esq. (via email, facsimile 212 637-2937 & First Class Mail)
Jared Scharf, Esq. (via email)

---

[4] Although the suretors are not a part of this "stop-gap" application, they are willing to sign a bond on behalf of Mr. Elia if the Court finds it necessary in addition to the two armed guards.